GENERAL ELECTRIC COMPANY, General Electric Environmental Services, Inc., Plaintiffs–Appellees,

v.

SARGENT & LUNDY, Lowell E. Ackmann, William A. Chittenden, David C. McClintock, Wilbert G. Hegener, Richard I. Gavin, George C. Kuhlman, Eugene V. Abraham, Robert F. Scheibel, Richard X. French, Donald L. Leone, Robert J. Mazza, John M. McLaughlin, Henry M. Sroka, Kenneth T. Kostal, John A. Werhane, Carment M. Chiappetta, Paul L. Wattelet, Donald E. Wolniak, Defendants–Appellants.

Nos. 89–5291, 89–5738.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 30, 1990.

Decided Oct. 24, 1990.

Rehearing and Rehearing En Banc Denied Dec. 14, 1990.

---

Charles S. Cassis, Victor B. Maddox (argued), John L. Dotson, Brown, Todd & Heyburn, Louisville, Ky., for General Elec. Co.

Charles S. Cassis, Victor B. Maddox, Louisville, Ky., for General Elec. Environmental Services, Inc.

James D. Ishmael, Jr., Wyatt, Tarrant & Combs, Lexington, Ky., Steven P. Handler (argued), James E. Betke, Lawrence E. Zabinski, Jane M. Simon, McDermott, Will & Emery, Chicago, Ill., for defendants-appellants.

Before KEITH and KRUPANSKY, Circuit Judges, and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

This diversity action controlled by Kentucky law is based upon a tort generally known as "injurious falsehood." Sargent & Lundy, an engineering firm, and its individual partners appeal a judgment entered upon a jury verdict awarding $500,000 plus interest and costs to General Electric Company and General Electric Environmental Services, Inc. ("GEESI") on their claims of injurious falsehood. In the district court, General Electric and GEESI essentially claimed that a third party, Kentucky Utilities Company, filed suit against them as a result of misrepresentations by Sargent & Lundy which blamed them for damage to Kentucky Utilities' power-generating facilities. General Electric and GEESI, a wholly owned subsidiary of General Electric, sought punitive damages and compensatory damages to recover the cost of defending against Kentucky Utilities' suit allegedly brought in reliance on Sargent & Lundy's false statements.

Sargent & Lundy primarily argues on appeal that the statements were absolutely privileged, or immune, since they were made preliminary to a judicial proceeding.

Sargent & Lundy contends that the district court therefore erred in denying its pre-trial motion to exclude the evidence. The controlling issue in this appeal is whether Kentucky applies an absolute immunity from suit to statements made preliminary to but in anticipation of litigation. We hold that it does and that it applies under the facts of this litigation. Accordingly, we reverse.

I.

On January 27, 1976, Sargent & Lundy, the principal architect-engineer for Kentucky Utilities since 1910, entered into an agreement with Kentucky Utilities. Sargent & Lundy agreed to furnish all architectural and engineering designs, studies, estimates, specifications, and contracts to put in operation electrostatic dust precipitators for Units 3 and 4 of Kentucky Utilities' coal power-generating station in Ghent, Kentucky. Under this agreement, Sargent & Lundy recommended that the Ghent facilities use hot-side electrostatic dust precipitators as the system for controlling the pollution produced during the generation of power. A precipitator removes fly ash or particulate matter from gas produced from burning coal. Impure flue gas flows from the boiler through inlet ductwork to the precipitator where the dust or fly ash is removed. The "clean" gas then flows through outlet ductwork to the chimney.

Kentucky Utilities also contracted with the Buell Division of Envirotech Corporation to supply the electrostatic precipitators and to perform model air flow studies of the proposed facilities. Sargent & Lundy prepared the specifications and the contracts for the design, development, manufacture, and delivery of the precipitators from Buell and also designed the inlet and outlet ductwork associated with these precipitators.

In July 1978, prior to the construction of the facility, Buell performed the model study known as the "Buell Test." The study, which used a scale plexiglass model of the precipitator and the inlet and outlet

ductwork, was conducted largely to demonstrate that the ductwork designed by Sargent & Lundy would provide uniform gas flow distribution. Rather than using fly ash, Buell introduced cork dust into the model precipitator and the associated ductwork to simulate the conditions of an actual unit. At that time, Buell and Sargent & Lundy were satisfied with the test results.

In April 1981, after the model tests were conducted and Unit 3 was manufactured and in the testing phase, General Electric purchased the Buell Division of Envirotech. General Electric, pursuant to a letter agreement, accepted responsibility for certain obligations to Kentucky Utilities with respect to the Ghent project. Kentucky Utilities permitted the arrangement with the understanding that Envirotech would remain liable for the project along with General Electric. General Electric then incorporated the Buell Division into GEESI, a wholly-owned subsidiary (collectively, "General Electric").

In May 1981, Kentucky Utilities placed Unit 3 of the coal-burning plant in operation. By September 1981, however, approximately three to five feet of fly ash had accumulated in the inlet ductwork of Unit 3, which forced a shutdown. Tears and cracks were observed in the metal inlet and outlet ductwork of the precipitator as well as in the precipitator itself. The repair and redesign of Unit 3 and Unit 4 cost Kentucky Utilities approximately $6 million.

In September 1981, Sargent & Lundy, at the request of Kentucky Utilities, undertook to investigate the cause of the damage. Kentucky Utilities and Sargent & Lundy also retained Boyle Laboratories in October 1981 to perform further model studies designed to determine possible remedies. In late December 1981, after reviewing the results of tests conducted by Boyle Laboratories, Sargent & Lundy met with Kentucky Utilities in January 1982 to present a report outlining the cause of the damage. Sargent & Lundy reported that an unexpected buildup of fly ash in the ductwork acted as an insulator and caused temperature differentials in the ductwork.

Sargent & Lundy concluded that the ductwork failed because the thermal stresses had exceeded design limits. Although Sargent & Lundy admitted that it had not designed for these temperature differentials, General Electric states that "Sargent & Lundy told Kentucky Utilities that a host of factors had united to cause [the] damage including Sargent & Lundy's design deficiencies and that although Kentucky Utilities had expended several million dollars on the repair and redesign of the Ghent facilities, significant backcharges would not be possible."

In August 1982, Kentucky Utilities informed Sargent & Lundy that it was considering litigation against Sargent & Lundy, GEESI and Envirotech to recover the costs of the repair and redesign of the Ghent facilities. Kentucky Utilities then requested from Sargent & Lundy a waiver of the statute of limitations, which Kentucky Utilities believed might expire in September 1982. Sargent & Lundy executed the waiver on August 26, 1982. General Electric alleges that at this point Sargent & Lundy began to "head off a possible lawsuit" by convincing Kentucky Utilities management that Sargent & Lundy's work was done in accordance with generally accepted engineering principles, but that the work of the Buell Division of Envirotech was negligent.

On October 27, 1982, Sargent & Lundy made a second presentation to Kentucky Utilities concerning the cause of the damage and responsibility for the repairs to the Ghent facilities. General Electric claims Sargent & Lundy's presentation differed dramatically from the earlier January presentation, and that rather than accepting responsibility for the damage, Sargent & Lundy blamed Envirotech. General Electric argues that Sargent & Lundy accomplished the deception by concealing the differences between the Buell Test conducted prior to the construction of the Ghent facilities and the Boyle Test designed to determine what went wrong with the constructed facilities.

General Electric claims that Sargent & Lundy represented that the subsequent

Boyle Test had *predicted* that fly ash would accumulate in the inlet ductwork and that the Buell Test was negligently conducted since it did not similarly predict this result. General Electric alleges that Sargent & Lundy therefore misled Kentucky Utilities by not informing them that the Boyle model had been "forced" to accumulate ash so that remedies could be tested, unlike the pre-construction Buell Test. Sargent & Lundy denies that any false statements were made, and contends that Kentucky Utilities was aware of the differences in the two model studies. General Electric states, however, that Kentucky Utilities relied upon Sargent & Lundy for the interpretation of the two model studies and that Sargent & Lundy intentionally misrepresented that Envirotech and GEESI were liable for the damages.

In May 1984, Kentucky Utilities retained another architect and engineering firm, Black & Veatch, to review the design of the precipitators and ductwork. Although the August report was critical of both Sargent & Lundy and Envirotech, the parties appear to agree that Kentucky Utilities' decision to sue pre-dated the report.

In August 1984, Kentucky Utilities filed suit against General Electric, GEESI, Envirotech, and Sargent & Lundy seeking recovery of the $6 million in repairs. General Electric and GEESI cross-claimed against Sargent & Lundy as the designer of the facility. Through discovery, Kentucky Utilities allegedly learned that Sargent & Lundy had misrepresented who was at fault for the damage to the facility and that Sargent & Lundy was solely responsible. On February 23, 1988, Kentucky Utilities voluntarily dismissed its claims with prejudice against General Electric, GEESI, and Envirotech.

On March 3, 1988, the district court granted Kentucky Utilities' motion to amend its complaint to assert a breach of fiduciary duty claim against Sargent & Lundy. The district court also granted motions by General Electric and GEESI to amend their cross-claims against Sargent & Lundy to plead their injurious falsehood theories. Shortly before trial, Sargent &

Lundy settled with Kentucky Utilities and Envirotech.

On December 2, 1988, several days before the trial on General Electric's cross-claim, Sargent & Lundy filed a motion *in limine* to exclude documents and statements to Kentucky Utilities after August 26, 1982, the date on which Sargent & Lundy provided Kentucky Utilities with a statute of limitations waiver. Sargent & Lundy contended that statements in connection with its report and investigation at Kentucky Utilities' request were absolutely privileged since they were made in contemplation of litigation. The district court denied the motion, concluding that the statements were not privileged and that even if they initially were, they lost privileged status because they were made in furtherance of a fraud. The district court also concluded that the motion actually was a motion for judgment on the pleadings, which the court held was untimely.

The jury trial began on December 7, 1988. On December 19, 1988, the jury returned its verdict awarding General Electric and GEESI $500,000, plus interest and costs. On February 9, 1989, the district court denied Sargent & Lundy's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

## II.

On appeal, Sargent & Lundy alleges numerous errors by the district court. First, Sargent & Lundy alleges that the district court erred in denying its pre-trial motion *in limine* to exclude testimony and documents relating to Sargent & Lundy's post-August 26, 1982 investigation. Second, Sargent & Lundy contends that the district court erred in denying the JNOV since there is insufficient evidence from which a jury could reasonably conclude (a) that Sargent & Lundy made false statements about General Electric and GEESI; (b) that Kentucky Utilities relied on any false statements in bringing suit against General Electric and GEESI; and (c) that the allegations in Kentucky Utilities' complaint were all related to Sargent & Lundy's alleged false statements. Third, Sargent &

Lundy argues that the cross-claims were barred by statute of limitations. Fourth, Sargent & Lundy argues that the district court erred in refusing to instruct the jury (a) that General Electric was required to prove the elements of its injurious falsehood claim by clear and convincing evidence; (b) that General Electric's injurious falsehood claim was subject to a statute of limitations defense; (c) that General Electric had to prove that Kentucky Utilities, in filing suit against General Electric, relied upon false statements made by Sargent & Lundy about General Electric; and (d) that a verdict against Sargent & Lundy required a finding that the allegations in Kentucky Utilities' complaint against General Electric were all related to Sargent & Lundy's alleged false statements about General Electric. Fifth, Sargent & Lundy claims that the district court denied it a fair trial by refusing to allow Sargent & Lundy to depose witnesses or obtain documents that directly related to the trial testimony of key General Electric witnesses. Finally, Sargent & Lundy argues that General Electric's bill of costs was untimely and they further object to particular costs.

### III.

Injurious falsehood generally "consist[s] of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general … of a kind calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage." W. Keeton, *Prosser and Keeton on the Law of Torts* § 128, at 967 (5th ed. 1984) (footnote omitted). The *Restatement* further describes this tort:

§ 623A. Liability for Publication of Injurious Falsehood—General Principle

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

*Restatement (Second) of Torts* § 623A, at 334 (1977).[1] This ill-defined tort is related to various other torts such as defamation, libel, trade libel, slander, slander of title, and interference with commercial or economic relations. *See* W. Keeton, *Law of Torts* § 128, at 962–64; *cf. Gray v. Central Bank & Trust Co.*, 562 S.W.2d 656 (Ky.App.1978). One commentator has indicated that "the injurious falsehood claim should be regarded merely as one form of intentional interference with economic relations rather than as a branch of the more general harm to reputation involved in libel and slander, even though, under the impact of Constitutional decisions, the rules governing the two torts may often prove to be much the same." W. Keeton, *Law of Torts* § 128, at 964 (footnotes omitted). This court recently stated that special damages in the form of pecuniary loss must be pleaded and proved in an injurious falsehood suit. *See Falls v. Sporting News Pub. Co.*, 834 F.2d 611, 617 (6th Cir.1987); *see also Restatement* § 623A comment f, at 340.

The district court concluded, upon a review of Kentucky law, that Kentucky would in fact recognize such a tort and denied Sargent & Lundy's motion to dismiss. The district court's decision partially was based upon Kentucky's recognition of related torts, Kentucky's reliance upon the *Restatement* as authority, and a Kentucky court's quotation of Prosser, which identified an injurious falsehood tort. *See Gray v. Central Bank & Trust Co.*, 562 S.W.2d at 657 (concluding that an absolute privilege conferred by statute to members of

---

1. "Publication of an injurious falsehood is its communication intentionally or by a negligent act to someone other than the person whose interest is affected." *Restatement* § 630, at 350. According to the *Restatement,* the "publication of an injurious falsehood is a legal cause of pecuniary loss if (a) it is a substantial factor in bringing about the loss, and (b) there is no rule of law relieving the publisher from liability because of the manner in which the publication has resulted in the loss." *Restatement* § 632, at 352.

city legislative body applied equally to actions founded upon defamation or the tort of interference with prospective economic relations). The issue of whether Kentucky would recognize such a tort has not been raised in this appeal, and we have no opportunity to review this conclusion.

The ultimately dispositive issue in this appeal is whether the district court erred in denying Sargent & Lundy's motion *in limine* to exclude post-August 1982 statements made in connection with the investigation of the damage to the Ghent units. In deciding this question, we follow the law of Kentucky as announced by that state's supreme court. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 462–66, 87 S.Ct. 1776, 1781–83, 18 L.Ed.2d 886 (1967); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where "the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it." *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir.1985). The "data" considered by federal courts when the highest state court has not spoken include "relevant dicta from the state supreme court, decisional law of appellate courts, restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. American Broadcasting Corp.*, 820 F.2d 806, 807 (6th Cir.1987) (citing *Bailey*, 770 F.2d at 604); *see also* 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 4507 (2nd ed. 1982).

■ The parties do not dispute that Kentucky courts have not considered whether an absolute privilege applies to statements made preliminary to a judicial proceeding. Our review of this issue begins with the *Restatement (Second) of Torts*, particularly since Kentucky courts frequently refer to this resource for guidance. *See, e.g., Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky.1989) (specifically adopting *Restatement* § 566, and that section's distinction between "pure" opinion and "mixed" expressions of opinion in the context of a libel suit); *McCall v. Courier–Journal & Louisville Times*, 623 S.W.2d 882, 887 (Ky.

1981) (in a suit for libel and invasion of privacy, the court adopted the false light aspect of the tort of invasion of privacy reflected in *Restatement* § 652A); *see also Prewitt v. Sexton*, 777 S.W.2d 891, 894 (Ky.1989) (relying extensively on Chapter 30 of the *Restatement*, entitled "Wrongful Use of Civil Proceedings"). *See generally Garrison v. Jervis B. Webb Co.*, 583 F.2d 258, 262 n. 6 (6th Cir.1978) ("It is appropriate for federal courts in diversity cases to look to the Restatements when there is no controlling state law on point [and] when the state has indicated, as has Kentucky, that it considers the Restatements to be persuasive authority.") (citations to Kentucky courts omitted).

The *Restatement* takes the position that the rules on absolute privilege to publish defamatory matter apply to the publication of an injurious falsehood. *Restatement* § 635, at 361. In other words, the "circumstances under which there is an absolute privilege to publish an injurious falsehood are in all respects the same as those under which there is an absolute privilege to publish matter that is personally defamatory." *Id.* § 635 comment a, at 362. The absolute privileges in the context of defamation

> are based chiefly upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests. To accomplish this, it is necessary for them to be protected not only from civil liability but also from the danger of even an unsuccessful civil action. To this end, it is necessary that the propriety of their conduct not be inquired into indirectly by either court or jury in civil proceedings brought against them for misconduct in their position. Therefore the privilege, or immunity, is absolute and the protection that it affords is complete. It is not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor. . . .

*Restatement,* introductory note to "Title B. Absolute Privilege Irrespective of Consent," at 243. The protection of the absolute privilege to publish defamatory material may be conferred upon judicial officers, attorneys, parties, witnesses, and jurors, among others. *See Restatement* §§ 585–89, at 244–51.

Kentucky courts have long recognized that statements in judicial proceedings, if relevant to the issues involved, are absolutely privileged, even though it may be claimed that they are false and alleged with malice. *See, e.g., Massengale v. Lester,* 403 S.W.2d 701, 702 (Ky.App.1966); *Schmitt v. Mann,* 291 Ky. 80, 163 S.W.2d 281, 283–84 (App.1942); *Lisanby v. Illinois Cent. R. Co.,* 209 Ky. 325, 272 S.W. 753, 754 (App.1925). General Electric contends, however, that Kentucky would not recognize an absolute privilege for communications *preliminary* to judicial proceedings, or prior to the initiation of suit, an issue the Kentucky courts have not had the opportunity to address. General Electric's argument is not well taken.

Under the *Restatement,* a party's communications are absolutely privileged to the extent that they are made preliminary to a judicial proceeding and in contemplation of litigation. Section 587 provides that

A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in *communications preliminary to a proposed judicial proceeding,* or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

*Restatement* § 587, at 248 (emphasis supplied). The privilege for communications preliminary to a proposed judicial proceeding, however, applies only "when the communication has some relation to a proceeding that is contemplated in good faith

and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." *Restatement* § 587 comment e, at 250. The limitation of the privilege is similarly stated in the context of communications by other potential participants in the judicial proceedings, including witnesses. *See, e.g., Restatement* § 588 comment e, at 251.

Kentucky courts in fact have cited provisions of the original *Restatement* which recognize the application of the absolute privilege in the context of communications preliminary to a judicial proceeding. *See Massengale,* 403 S.W.2d at 702 (citing *Restatement of Torts* § 587, covering parties); *Schmitt,* 163 S.W.2d at 284 (quoting *Restatement of Torts* § 588, covering witnesses). In *Schmitt,* the Kentucky appellate court cited with approval a section of the original *Restatement* which recognized a witness' absolute privilege to publish defamatory matter in communications preliminary to a proposed judicial proceeding:[2]

The doctrine of privileged communications rests upon public policy "which looks to the free and unfettered administration of justice, though, as an incidental result, it may, in some instances, afford an immunity to the evil-disposed and malignant slanderer." . . . In the American Law Institute's Restatement of the Law of Torts, volume 3, section 588, the rule is stated: "A witness is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding and as a part of a judicial proceeding in which he is testifying, if it has some relation thereto."

*Schmitt,* 163 S.W.2d at 284. Although *Schmitt* and *Massengale* involved the application of the privilege to communications made *in* judicial proceedings by witnesses and parties, respectively, the tacit endorse-

---

**2.** The current *Restatement* regarding witnesses is nearly identical:

A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed

judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceedings.

*Restatement* § 588, at 250.

ment of the privilege as applied to communications *preliminary* to a judicial proceeding is persuasive. *See generally* W. Haynes, *Kentucky Jurisprudence*, Torts § 8–7, at 185–86 (1987) (recognizing that the view expressed by the *Restatement* on the absolute privilege is "in harmony with the Kentucky view"). From all of this, we must conclude that Kentucky would in the proper case apply the absolute privilege to communications by a party made preliminary to a seriously considered judicial proceeding. The conclusion is informed by Kentucky's historical acceptance of the absolute privilege, Kentucky's citation to provisions of the *Restatement* which recognize that the privilege applies to communications preliminary to a proposed judicial proceeding, and the persuasiveness of the *Restatement* itself as an indicator of the "majority rule." [3]

■ Having concluded that Kentucky recognizes the privilege, the question then is whether the privilege applies in this case. The question turns upon a two-part analysis. First, the occasion of the communication must be examined to determine if the statement was made "preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding." *Restatement* § 587, at 248. Second, a court must evaluate the content of the statement to determine if it "has some relation to a proceeding that is contemplated in good faith and under serious consideration." *Restatement* § 587 comments c and e, at 249–50. *See generally, Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 697 (8th Cir.1979).

■ While Sargent & Lundy contends that all of its statements to Kentucky Utilities after the execution of the statute of limitations waiver are privileged, it most vigorously argues that the privilege applies to the statements at the October 1982 meeting. General Electric does not seriously dispute that Sargent & Lundy's statements at the October 1982 meeting were made when Kentucky Utilities was considering litigation. The company acknowledges as much in its brief: "In August, 1982 ... Kentucky Utilities indicated to Sargent & Lundy that it was considering litigation against Sargent & Lundy and against GEESI and Envirotech to recover the costs of the repair and redesign of the Ghent facilities." General Electric further admits that Kentucky Utilities asked Sargent & Lundy to execute a statute of limitations waiver several months earlier, and that Sargent & Lundy actually executed that waiver in late August, 1982. We therefore have little difficulty in concluding that the statements post-dating the statute of limitations waiver were "communications preliminary to a proposed judicial proceeding" which was "under serious consideration." *Restatement (Second) of Torts* § 587 and comment e, at 250. Kentucky Utilities specifically requested that Sargent & Lundy investigate what went wrong at the Ghent facilities so that it could determine liability. These statements clearly were made in contemplation of a lawsuit.

General Electric also admits that Sargent & Lundy's statements, particularly at the October 1982 meeting, were relevant to the contemplated judicial proceeding. Scott Wendelsdorf, an attorney for Kentucky Utilities, testified that he extensively relied upon the October statements by Sargent & Lundy to Kentucky Utilities to prepare the complaint against General Electric. Further, General Electric's entire case is pinned upon the argument that Sargent & Lundy's statements were a substantial factor in causing the judicial proceeding. If we believe Sargent & Lundy, then the statements were intended simply to apportion blame for the damage and to advise

---

3. Numerous federal and state courts have recognized the absolute privilege of communications preliminary to judicial proceedings. Among the federal courts, see *McLean v. International Harvester Co.*, 817 F.2d 1214, 1220 (5th Cir.1987); *Hagendorf v. Brown*, 699 F.2d 478, 480, *modified*, 707 F.2d 1018 (9th Cir.1983); *Sriberg v. Raymond*, 544 F.2d 15, 16 (1st Cir.1976); *Brown v. Collins*, 402 F.2d 209, 212–13 (D.C.Cir.1968); *Johnston v. Cartwright*, 355 F.2d 32, 36–38 (8th Cir.1966); *Pinto v. Internationale Set, Inc.*, 650 F.Supp. 306, 308 (D.Minn.1986); *Jones v. RCA Music Service*, 530 F.Supp. 767, 768 (E.D.Penn. 1982); *Barnes v. Avis*, 466 F.Supp. 907, 909 (D.D.C.1979).

Kentucky Utilities in its litigation strategy. If we believe General Electric, Sargent & Lundy sought to avoid liability and, of necessity, place the blame upon the other contractors. In either case, the statements have "some relation" to the contemplated judicial proceeding. *See Restatement* § 587 comment e, at 250. These statements would therefore appear to fall easily within *Restatement* § 587 and the scope of the absolute privilege as applied to parties.

Without directly disputing that the statements were made preliminary to a proposed judicial proceeding, the district court nevertheless held that the privilege did not apply. In so holding, the district court sought to distinguish *Western Technologies v. Sverdrup & Parcel*, 154 Ariz. 1, 739 P.2d 1318 (1986), relied upon by Sargent & Lundy to demonstrate the application of the privilege. In *Western Technologies*, Sverdrup successfully raised an absolute privilege in defense of plaintiff's injurious falsehood suit. Sverdrup, an engineering firm, was hired by the Arizona Board of Regents to determine who was at fault for structural damage to a newly expanded stadium. Sverdrup's report partially blamed an engineering firm, Western Technologies, which had been retained by the Board to perform engineering testing prior to the expansions on the stadium. Western Technologies later sued Sverdrup claiming, among other things, that Sverdrup's report to the Board amounted to fraudulent and negligent misrepresentation and intentional interference with prospective contractual relations. 154 Ariz. at 3, 739 P.2d at 1320.

In affirming the dismissal of the injurious falsehood claim, the Arizona Court of Appeals concluded that Sverdrup's statements were absolutely privileged since the Board was seriously contemplating litigation:

> Sverdrup made its statements while the Board was seriously contemplating litigation. Furthermore, because the Board could not assert Western's liability until it obtained an expert assessment of Western's fault, Sverdrup's reports constituted "a necessary step in taking legal action." [W. Keeton, *Law of Torts* § 114, at 820.] Finally, the Board actual-

ly relied upon the reports in bringing suit. Consequently, Sverdrup's reports and recommendations are absolutely privileged and Sverdrup's motives are irrelevant.

154 Ariz. at 5, 739 P.2d at 1322. The conclusions of *Western Technologies* would appear to be equally applicable here, particularly since Kentucky Utilities retained Sargent & Lundy to assist in the investigation of the damage to the Ghent facilities, so that it could bring suit against the responsible parties. General Electric argues, however, that the district court here correctly distinguished *Western Technologies* on the ground that Sverdrup "was a totally objective consultant, hired after the completion of the project." The court further stated that "Sverdrup was an independent actor, unlike Sargent & Lundy, and had no interest in any eventual litigation, other than producing an unbiased analysis and opinion of the underlying problem." General Electric and the district court cite no authority for the proposition that the absolute privilege applies only to so-called "independent" consultants. General Electric nevertheless argues that the privilege should not apply since Sargent & Lundy was "engaged in a scheme to cover up its own liability and to shift the responsibility onto innocent parties."

General Electric and the district court, however, misperceive the effect of an absolute privilege. The *Restatement*, as well as Kentucky courts, recognizes that a court may not inquire into the motives of the speaker. *See, e.g., Restatement,* introductory note to "Title B. Absolute Privilege Irrespective of Consent," at 243; *Stewart v. Williams*, 309 Ky. 706, 218 S.W.2d 948, 949–50 (App.1949) (when a communication is privileged, defamatory words maliciously spoken will not give rise to a cause of action for defamation); *Schmitt,* 163 S.W.2d at 283 (same); W. Haynes, *Kentucky Jurisprudence,* Torts § 8–3, at 182 (same); *id.* § 8–6, at 175 (same). The absolute privilege, unlike a qualified privilege, renders the speaker's motives and intent irrelevant in light of the public policy favoring freedom to speak freely and without

fear of civil suit and financial hazard. The application of the privilege therefore cannot turn on whether Sargent & Lundy had an "interest in any eventual litigation," as the district court concluded.

The district court's misunderstanding appears to lie in its focus upon the absolute privilege as it applies to witnesses. The district court concluded that it "seems that the rationale of the *Western Technologies* court in recognizing the absolute privilege defense was to protect the expert, consultant or witness from being subjected to claims based on *independent* reports, testimony or other communications. Sargent & Lundy's reports, testimony and other communications were anything but independent." (Order dated December 9, 1988, at 3). The privilege not only applies to witnesses, however, but it equally applies to a *party* 's communications made preliminary to a seriously considered judicial proceeding. *See Restatement* § 587. Even though the privilege may arise under different circumstances, the public policy justification underlying the privilege in either the case of the witness or the party is the same. Communications by parties and witnesses are protected to promote the development and free exchange of information and to foster judicial and extra-judicial resolution of disputes. It is therefore immaterial whether Sargent & Lundy claims this absolute privilege because of its special relationship as an investigator of the damage to the Ghent facilities or as a party protecting its own interests preliminary to a seriously contemplated judicial proceeding. In either case, these statements are absolutely privileged and may not form the basis for General Electric's injurious falsehood suit.[4]

The late Senior Judge Thomas F. McAllister of our court perhaps stated it best: "It is cold comfort to the appellant to be told that although statements made about him are libelous or slanderous, he can bring no action for defamation, even if the person making the statements knows they are false; and that, since they were made in reference to impending litigation, they are privileged. But that is the law." *See Theiss v. Scherer*, 396 F.2d 646, 650 (6th Cir.1968) (McAllister, J. concurring).

## IV.

One last related issue remains. As an alternative basis for denying the motion, the district court held that Sargent & Lundy's motion *in limine* was untimely. The December 2, 1988 motion certainly was filed on the eve of the scheduled trial date of December 5. In denying the motion, the district court appears to have been persuaded by two arguments. First, the district court stated that the motion seeking to invoke the absolute privilege was actually an affirmative defense. The court therefore treated the motion as a motion to amend, which it deemed untimely, and concluded that the defense had been waived. Second, the district court stated that although the motion was "styled as a motion in limine, in reality it is a motion for judgment on the pleadings because if Sargent & Lundy were to prevail on this motion, GEESI would effectively be barred from intro-

---

**4.** The district court and General Electric argue that even if there initially was a privilege, then the privilege was lost because the statements were made in furtherance of fraud. General Electric relegates this "fraud" argument to a brief footnote, and Sargent & Lundy does not directly address it. The district court cites a Kentucky case for this proposition. *See Fidelity–Phenix Fire Insurance Company of New York v. Hamilton*, 340 S.W.2d 218 (Ky.App.1960), where the court permitted an attorney to testify regarding fraudulent statements made by a potential client. The court therefore refused to permit the attorney-client privilege to protect the statements.

That argument is not well taken here because we are dealing with an absolute immunity. If we believe General Electric, then Sargent & Lundy's motive was to shift blame away from themselves and upon the other contractors. An intent to deceive lies at the heart of fraud, but intent is precisely what the rule renders immaterial.

General Electric cites no cases for its proposition that these communications are not privileged because they were purportedly made in furtherance of a fraud. None of the cases reviewed has specifically discussed the issue. In *Western Technologies,* for example, there were some fraud claims, but the court said nothing about them in its conclusion that the statements were absolutely privileged.

ducing any evidence to prove its claim against Sargent & Lundy." (Order dated December 9, 1988, at 2.)

■ Sargent & Lundy does not dispute here that the invocation of the absolute privilege is an affirmative defense. *See Restatement* § 651(2) at 372 (the defendant has the burden of proving that the absolute privilege applies). Rather, Sargent & Lundy argues that the district court erred in not permitting an amendment. Under Fed. R.Civ.P. 15(a), leave to amend pleadings "shall be freely given when justice so requires." The decision whether or not to permit the amendment is committed to the discretion of the trial court. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–32, 91 S.Ct. 795, 802–03, 28 L.Ed.2d 77 (1971); *Estes v. Kentucky Util. Co.*, 636 F.2d 1131, 1133 (6th Cir.1980). This discretion, however, is "limited by Fed.R.Civ.P. 15(a)'s liberal policy of permitting amendments to ensure the determination of claims on their merits." *See Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir.1987) (citation omitted). General Electric suggests that the jurisprudence on amending responsive pleadings is not relevant in this review since Sargent & Lundy filed no motion to amend. The district court, however, treated the motion as a motion to amend and then denied it as untimely. Rule 15(a) clearly is relevant.

In the decision whether to permit an amendment, some of the factors which may be considered by the trial court are undue "delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Hageman v. Signal L.P. Gas, Inc.* 486 F.2d 479, 484 (6th Cir.1973). This circuit has emphasized that delay by itself is not sufficient to deny a motion to amend. *Id.* Aside from listing the relevant factors, General Electric has made no attempt to demonstrate that any of these factors should prevent the amendment. Conspicuously absent from General Electric's brief is any argument that it suffered prejudice in the prosecution of its case, a factor this court has repeatedly emphasized is crucial in the inquiry. *See, e.g., Moore v. Paducah*, 790 F.2d 557, 562 (6th Cir.1986) (per curiam); *Tefft v. Seward*, 689 F.2d 637 (6th Cir.1982). General Electric simply does not argue that it would have done anything differently had the defense been presented in Sargent & Lundy's initial answer.

■ Further, in Kentucky, the question whether or not privilege applies is a matter of law for the court's determination. *See, e.g., Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270 (Ky.App.1981); *Caslin v. General Electric Co.*, 608 S.W.2d 69 (Ky. App.1980); W. Haynes, *Kentucky Jurisprudence*, Torts § 8–3, at 175–76. There were no new questions of fact to be explored. General Electric does not argue in this court that it needed additional discovery into the circumstances of the statements, or that the ruling necessitated an undue delay in the trial.[5] In fact, the district court's alternative ruling on the merits of the motion demonstrates the clarity of the presentation.

■ Notwithstanding the application of those principles which we have cited and which have convinced us that it was error for the court to deny the motion to amend, we still recognize that the question is a close one. Since the court rules vest the discretion in the trial judge, we ordinarily would be loath to disturb that exercise even under the circumstances here. At the same time, we cannot help observing that the existence and the nature of this defense in Kentucky law is not entirely clear. While we are satisfied that it is properly considered an affirmative defense, as reflected in the *Restatement*, nothing in Kentucky law expressly so holds. The defense arguably could be considered an evidentiary matter, which would involve the exclu-

---

5. The delay in this case cannot be characterized as unfairly prejudicial to General Electric, particularly since General Electric dramatically changed the nature of this suit nine months before Sargent & Lundy's motion was filed. In March 1988, General Electric supplemented its original cross-claim to plead its injurious falsehood theory, more than three years after its initial cross-claim was filed.

sion of any evidence privileged from disclosure. The application of this rule therefore would not require an amendment of the pleadings, but would simply be left for resolution when the plaintiff sought to introduce the challenged statements at trial. Thus, the delay in asserting this privilege as a formal defense is perhaps more understandable in light of the ill-defined nature and application of the privilege. We note that the trial judge also seems to have entertained considerable uncertainty as to the applicability and nature of the immunity involved here. That being the case and especially in the light of the absence of any prejudice to the plaintiff from the untimely assertion of the absolute privilege, we are persuaded that Sargent & Lundy should have been permitted to interpose the defense. The district court's ruling that an amendment would be untimely therefore cannot stand.

For many of the same reasons, we believe the district court erred in concluding that the motion was an untimely motion for judgment on the pleadings. Fed.R. Civ.P. 12(c) provides that any party may move for a judgment on the pleadings after "the pleadings are closed but within such time as not to delay the trial." We do not dispute the district court's conclusion that granting the motion would amount to a judgment on the pleadings since General Electric apparently could proffer no non-privileged statements to support its theory. In fact, General Electric admits that Sargent & Lundy's pre-August statements to Kentucky Utilities were true.

The district court's error lies in the conclusion that the delay barred the consideration of the motion. Again, General Electric does not argue that it was prejudiced in the prosecution of its case, nor does General Electric claim that the district court lacked a sufficient factual predicate to make this legal determination. In light of our conclusion that Sargent & Lundy's motion is well-supported and General Electric's failure to articulate a basis for any prejudice caused by the delay, the alleged untimeliness of the motion is no bar to the dismissal of this suit.

Accordingly, the district court's judgment is REVERSED and the cause is REMANDED for proceedings consistent with this opinion.