IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

_____

JOSEPH F. MYERS, and
CARL D. KLIMEK d/b/a
MK ASSOCIATES,

     Plaintiffs-Appellants,

Vs.

                                     C.A. No. 02A01-9605-CV-00124
                                     Shelby law No. 45135 T.D.

PICKERING FIRM, INCORPORATED,

     Defendant-Appellee.

FILED

May 22, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

_____

FROM THE SHELBY COUNTY CIRCUIT COURT
THE HONORABLE ROBERT A. LANIER, JUDGE

Richard M. Carter and Scott T. Beall
Martin, Tate, Morrow & Marston, P.C., of Memphis
For Plaintiffs-Appellants

Jerry O. Potter and William B. Walk, Jr.
The Hardison Law Firm, P.C.
For Defendant-Appellee

*AFFIRMED AS MODIFIED AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.**

**CONCUR:**

**DAVID R. FARMER, JUDGE**

**HEWITT P. TOMLIN, JR., SENIOR JUDGE**

This appeal involves a suit for libel and for procurement of breach of contract.

PLEADINGS

The first amended complaint filed in the circuit court by the plaintiffs, Joseph F. Myers

and Carl D. Klimek d/b/a M K Associates (MK), against the defendant, Pickering Firm, Incorporated (Pickering), alleges, in substance, that in July 1985 MK had a contract with Lutheran Social Services of Memphis, Inc. (LSSM)[1] to perform architectural services in connection with the design and construction of a five-story residential home for the elderly that was part of Lutheran Village and was referred to in the complaint as Project A. Subsequently, in July 1988, MK entered into another contract with LSSM to perform architectural services in connection with the design and construction of twenty-five townhouse units, which were also to be a part of Lutheran Village and were described in the complaint as Project B. In May of 1989, LSSM contracted with Fogelman/Byrnes and Doggett (FB&D)[2] as contractors for the construction of both projects. During the course of construction, MK noted defects in the work performed by the contractor that were not timely cured. As a result of FB&D's failure to complete the work, MK refused to certify draw requests submitted by FB&D and recommended that LSSM have the work corrected by another contractor. The complaint alleges that Project A never reached a stage of completion at which it could be certified as substantially complete as described in the contract and that Project B never reached the level of completion for a final inspection.

MK avers in its complaint that, in February 1991, FB&D filed suit in the Chancery Court of Shelby County against LSSM, MK, and Myers and Klimek, individually, as a result of MK's refusal to certify draw requests. MK's complaint further avers that after the FB&D suit was filed, and on or about March 22, 1991, LSSM entered into a contract with Pickering for Pickering to perform independent on-site documentary review of both projects and to report its findings as to the quality and completeness of the construction documents and the status of the construction projects. MK's complaint also alleges that Pickering issued a report to LSSM dated April 15, 1991 that contained many false and defamatory statements about MK's work as the architect on the two projects, and notwithstanding notification that the report was false and erroneous, Pickering failed and refused to correct the statements therein. The complaint further

---

[1] MK originally entered into the contract with Luther Terrace, Inc. and Lutheran Social Services of Tennessee, Inc., but subsequent to the contract date, LSSM assumed all of the owner's rights and obligations under the contract.

[2] FB&D is a Delaware limited partnership with its principal place of business in Memphis, Tennessee. Its general partner is Fogelman Properties, Inc.

alleges that in late April or early May 1991, Pickering contracted with LSSM for Pickering to be in effect the project architect on the two projects. The complaint alleges that Pickering acted willfully, intentionally, maliciously, and recklessly when it published and republished the report without correction and that Pickering maliciously procured the breach of MK's two contracts with LSSM. The complaint seeks both compensatory and punitive damages for the libel and also seeks recovery both under the common law and by virtue of T.C.A. § 47-50-109 (1995) for the procurement of the breach of the contracts.

Pickering's answer denies the material allegations of the complaint and joins issue thereon and affirmatively avers that its report was privileged because the firm was hired as an expert in anticipation of the chancery court litigation and the report was issued in furtherance of that proceeding. Pickering denies that there was publication of the report and further denies that there was a breach of any contracts between LSSM and MK or that Pickering was in any way responsible for inducing any breach of such contracts.

Prior to trial, the trial court granted a partial summary judgment to Pickering and ruled that the April 15 report was absolutely privileged in its publication to LSSM, members of the LSSM board, representatives of Lutheran Church Extension Fund, Inc. (LSSM's lender), Jim Carson (special master in the chancery court), FB&D, and United States Fidelity & Guaranty Company (the bonding company). The court did not grant summary judgment as to the publication to Omega Contractors, Inc. (Omega), the replacement contractor, Omega's subcontractors, Thompson-White Associates (Thompson-White), the marketing agent for LSSM, and T-W Concepts, Inc., the construction manager.

After a five-week jury trial, the case was submitted to the jury as to the issues of the alleged libel by publication of the report to Omega, Thompson-White, and T-W Concepts and as to the issue of whether Pickering procured or induced the breach of MK's contracts with LSSM. In the libel action, the jury returned a verdict for MK in the amount of $600,000.00 in compensatory damages and $100,000.00 in punitive damages. In the procurement or inducement of breach of contract actions, the jury awarded MK $750,000.00 as compensatory damages, and under T.C.A. § 47-50-109, the damages were trebled.

As a result of post-trial motions, Pickering was granted a judgment notwithstanding the verdict on the actions for procurement of breach of contract.

3

ISSUES

Both MK and Pickering have appealed. MK presents the following issues for review:

> 1. Whether the trial court erred when it granted Pickering's Motion for Judgment Notwithstanding the Verdict on the claim of tortious interference with contract that went beyond Pickering's use of false statements in Pickering's April 15, 1991 Inspection Report of Findings.

> 2. Whether the trial court on summary judgment and on judgment notwithstanding the verdict erred in expanding Tennessee's "witness privilege" to immunize the non-litigation use of the unsigned, unsealed, unsworn Report that was published by Pickering only in its corporate capacity, which contained false and malicious statements designed to induce LSSM to breach its contracts with MK and was thereafter used in the construction process.

> 3. Whether the trial court erred in its February 9, 1995 Order On Pending Motions when it found that MK had no existing binding contracts with which Pickering intentionally interfered.

Pickering presents the following additional issues for our review:

> 1. Whether the trial court erred in not granting Pickering's Motion for Directed Verdict on the libel claims that were not excluded by the previous ruling on Pickering's Motion for Summary Judgment.

> 2. Whether the trial court committed error in not ruling that the verdict was contrary to the weight of the evidence in regard to the damages that were awarded.

> 3. Whether the court erred in not defining the correct burden of proof to the jury in regard to the statutory procurement of breach of contract claim of MK.

FACTS

On July 2, 1985, LSSM, a Tennessee not-for-profit corporation, entered into a written contract with MK for architectural services in connection with the design and construction of a five story, residential home for the elderly (Project A) that was to be part of the Lutheran Village Project. On July 27, 1988, LSSM entered into a second written contract with MK for architectural services in connection with the design and construction of twenty-five townhouse units for the elderly (Project B). Both of MK's contracts with LSSM were standard American Institute of Architects architectural services contracts. On May 15, 1989, LSSM chose FB&D as the general contractor on both projects. Construction of Projects A and B began in August of 1989. In August or September of 1990, LSSM contracted with Thompson-White to market and sell the units in both projects. Problems arose during the construction, and in January 1991,

4

MK refused to certify a draw request submitted by FB&D. LSSM contacted Omega as a neutral party to evaluate the projects and to determine the quality of the construction.

On February 18, 1991, FB&D filed suit in the chancery court against LSSM, MK, and Myers and Klimek individually. Because the chancery court lawsuit is relevant to the issues raised in this appeal, we will examine the pleadings in that case.[3] In its complaint, FB&D alleges, *inter alia*, that LSSM breached its contract with FB&D by not paying for all the work performed and that MK interfered with the contract between FB&D and LSSM by inducing LSSM's breach. The complaint also alleges that MK was guilty of negligent supervision with respect to the construction process:

> The Defendants, MK Associates, Carl D. Klimek, individually, and Joseph Myers, individually, breached their duty to Plaintiff by failing to use ordinary care in the preparation of the plans and specifications, supervision, inspection, administration, coordination and in the performance of their contractual duties. Said breaches by Defendants include, without limitation: not allowing Plaintiff to perform work under the contract as it had scheduled, causing Plaintiff to perform an abnormal amount of work on the project; repeated failures to give proper and timely directions to Plaintiff; failure to design the Project in accordance with applicable codes, laws and regulations; failure to provide adequate and timely job site supervision; failure to properly evaluate the work accomplished by Plaintiff; failure to certify payment requests; failure to specifically identify problems perceived in the work and issue punch lists in a timely and specific manner so that corrections could be accomplished economically.

On March 22, 1991, LSSM entered into a contract with Pickering, a multi-disciplined engineering and architectural firm, to perform an independent, on-site, documented review of various aspects of Projects A and B and to determine the priority of items needed to be completed for a certificate of occupancy. After completing its inspection, Pickering published a report on April 15, 1991, titled "Inspection Report of Findings for Lutheran Social Services of Memphis, Inc. of Project A: Lutheran Village Mid-Rise and Project B: Townhouses" (Report). Pickering delivered copies of the Report to LSSM, Thompson-White, and Omega. On May 1, 1991, MK wrote a letter to LSSM and sent a copy of the letter to Pickering asserting that the Report contained errors and expressing concerns about the impact the Report would have on MK's professional reputation. Pickering did not respond to this letter and did not correct or

---

[3] At the time of this appeal, the chancery court litigation was still pending.

retract any statements made in the Report. Pickering published another report, dated July 16, 1991, titled "Punch List Items Supplement To Inspection Report Of Findings For Lutheran Social Services Of Memphis, Inc." J. Martin Regan, Jr., LSSM's attorney, wrote a letter dated October 8, 1991 to Omega and Pickering requesting their further assistance as expert witnesses in preparing additional documents to aid LSSM in the chancery court litigation. Pickering responded by a letter and attachment dated October 11, 1991. Pickering also republished the entire text of the original Report in an "Interim Report for Lutheran Social Services of Memphis, Inc." dated November 25, 1991.[4]

After Pickering published the original Report, MK's relationship with LSSM deteriorated. James Stanton Hobbs, Pickering's Project Manager, began negotiating with LSSM for architectural services in mid-to-late April 1991. On April 30, 1991, Pickering sent LSSM a contract for architectural services. On May 16, 1991, LSSM filed its answer in the chancery court lawsuit and a cross-complaint against MK alleging that MK breached its contract with LSSM, negligently prepared plans and specifications, and did not provide proper contract administration. On May 28, 1991, Pickering and LSSM executed a second written contract, which provided that Pickering would perform "contract administration" on Projects A and B. On July 24, 1991, MK submitted a "Proposal For Services" to LSSM to "provide contract administration basic services for the completion of Lutheran Village based on a construction period of 120 days for $40,800.00." LSSM did not accept MK's proposal. On July 31, 1991, LSSM filed its answers to interrogatories propounded by FB&D in the chancery court lawsuit and identified Pickering as an expert witness whose representatives would be called at that trial. On August 28, 1991, LSSM sent MK a letter giving seven days written notice of termination of the contracts between the parties. The letter states:

> This letter is to serve as seven days written notice of the termination of the Agreements between Lutheran Social Services of Memphis, Inc. and MK Associates Architects/Planners in connection with the projects commonly known as the 25 Townhouse Units for Lutheran Village and the Atrium Building at Scheibler Road and New Covington Pike, Memphis, Tennessee. This notice is given pursuant to the termination of

---

[4] The record is unclear as to whom Pickering published this report, however, to simplify proof at trial, MK did not rely on any communications other than the original Report except to the extent that other communications republished the text of the original Report. Consequently, those documents are not relevant to this appeal.

agreement provisions of the contracts and is based upon your failure to substantially perform in accordance with the terms of the contracts.

On or about October 14, 1991, MK, Myers, and Klimek filed a cross-action in the chancery suit against LSSM, alleging breach of contract, libel and slander, and negligence. In December of 1991, LSSM filed an answer to MK's cross-action in the chancery court stating, *inter alia*, the following:

LSSM states that any actions which it took in terminating the Architects and retaining the services of new Architects were taken in order to mitigate its damages and to bring the project to completion in accordance with applicable codes, laws and industry standards and as a consequence of the breach by the Architects by their contracts as set forth in LSSM's cross-claim.

CONSIDERATION OF ISSUES

We will consider MK's first two issues raised in this appeal of the circuit court lawsuit together:

1. Whether the trial court erred when it granted Pickering's Motion for Judgment Notwithstanding the Verdict on the claim of tortious interference with contract that went beyond Pickering's use of false statements in Pickering's April 15, 1991 Inspection Report of Findings.

2. Whether the trial court on summary judgment and on judgment notwithstanding the verdict erred in expanding Tennessee's "witness privilege" to immunize the nonlitigation use of the unsigned, unsealed, unsworn Report that was published by Pickering only in its corporate capacity, which contained false and malicious statements designed to induce LSSM to breach its contracts with MK and was thereafter used in the construction process.

The trial court's order granting Pickering a judgment notwithstanding the verdict is premised on the trial court's finding that Pickering's statements in the Report were absolutely privileged as communicated to LSSM, therefore barring MK's claims for inducement to breach of contract, and also on the court's finding that there were no existing binding contracts between LSSM and MK.

MK asserts that the trial court erred in granting the judgment notwithstanding the verdict for the following reasons: (1) there was no absolute privilege afforded the publication; (2) if there were such a privilege, Pickering took actions other than the statements in the Report that procured or induced the breach of the contract; and (3) there were in existence two viable and binding contracts between LSSM and MK that were subject to breach.

7

The duty of a trial or appellate judge in dealing with a judgment notwithstanding a verdict is well established in our jurisprudence:

> A post-trial motion for the entry of judgment in accordance with a motion for a directed verdict made during the trial must be gauged by the usual rules relating to directed verdicts. Those rules require that the trial judge, and the appellate courts, take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977) (citations omitted).

MK's actions against Pickering for inducement to breach a contract are based on the common law and on T.C.A. § 47-50-109 (1995). Section 47-50-109 provides:

> **47-50-109. Procurement of breach of contracts unlawful — Damages.—** It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

The statute is declaratory of the common law except as to the amount of damages that may be recovered against a wrongdoer. *New Life Corp. of America v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 926 (Tenn. App. 1996) (citing *Emmco Ins. Co. v. Beacon Mut. Indem. Co.*, 204 Tenn. 540, 551, 322 S.W.2d 226, 231 (1959)). In *Emmco Insurance Co. v. Beacon Mutual Indemnity Co.*, 204 Tenn. 540, 322 S.W.2d 226 (1959), our Supreme Court stated:

> The Code Section relied on (47-1706, T.C.A. [now T.C.A. § 47-50-109] ) and made the basis of this action . . . contemplates the improper inducement, and we might add the unlawful conduct, of the alleged wrongdoer whereby a contract is broken. The statute contemplates the imposition of a severe penalty, "and should not be enforced except upon a clear showing." *Lichter v. Fulcher*, 22 Tenn. App. 670, 125 S.W.2d 501, 508.

*Emmco Ins. Co.*, 204 Tenn. at 549-50, 322 S.W.2d at 230-31.

The elements of a cause of action for procurement of the breach of a contract are: 1) there must be a legal contract; 2) the wrongdoer must have knowledge of the existence of the contract; 3) there must be an intention to induce its breach; 4) the wrongdoer must have acted

maliciously; 5) there must be a breach of the contract; 6) the act complained of must be the proximate cause of the breach of the contract; and, 7) there must have been damages resulting from the breach of the contract. *New Life Corp.*, 932 S.W.2d at 926 (citing *Campbell v. Matlock*, 749 S.W.2d 748, 751 (Tenn. App. 1987); *Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn. App. 1975)).

Considering the basis of the trial court's grant of the judgment notwithstanding the verdict and keeping the above rules in mind, we must determine whether the statements in the Report that Pickering communicated to LSSM were privileged, and if so, whether the privilege should apply to a cause of action for procurement of a breach of the contract. Our inquiry, under the above rules, is premised on acceptance of the fact that defamatory statements were made by Pickering in the Report and communicated to LSSM.

Tennessee has long recognized that statements made in the course of judicial proceedings are absolutely privileged. *See, e.g.*, *Lea v. White*, 36 Tenn. (4 Sneed) 111, 114 (1856) (holding that statements made in a return to a writ of *habeas corpus* were absolutely privileged so as to bar a cause of action for libel). This absolute privilege also applies to statements made by witnesses in the course of judicial proceedings. *See, e.g.*, *Shadden v. McElwee*, 86 Tenn. (2 Pick.) 146, 5 S.W. 602 (1887) (asserting that a witness is absolutely privileged as to all matters relevant to the issues in the case).

In *Jones v. Trice*, 210 Tenn. 535, 360 S.W.2d 48 (Tenn. 1962), the Tennessee Supreme Court discussed the absolute privilege applicable to judicial proceedings. In that case, Jones had attended a trial in which Trice was a defendant as executrix of an estate. *Id.* at 49. After a jury verdict against Trice, she moved for a new trial on the ground, *inter alia,* that Jones improperly influenced the jury in her case. *Id.* When Jones sued Trice for libel based on the allegations in her motion for a new trial, Trice demurred on the ground that the statements were absolutely privileged because they were made in the course of a judicial proceeding. *Id.* at 50.

On appeal of the trial court's order sustaining the demurrer, the Court stated:

> The general rule is that statements made in the course of judicial proceedings which are relevant and pertinent to the issues are absolutely privileged, and therefore cannot be used as a basis for a libel action for damages. This rule holds true even though such statements are false, known to be false or even malicious.

*Id.* (citations omitted). The Court further set forth the view contained in the *Restatement of*

*Torts*:

> "A party to a private litigation . . . is absolutely privileged to publish false and defamatory matter of another in <u>communications preliminary to a proposed judicial proceeding,</u> or in the institution of or during the course and as a part of a judicial proceeding in which he participates, if the matter had some relation thereto."

*Id.* at 51 (quoting *Restatement of Torts* § 587)(emphasis added). From these and other authorities, the Court reasoned that "a statement by a judge, witness, counsel, or party, to be absolutely privileged, must meet two conditions, viz: (1) It must be in the course of a judicial proceeding, and (2) it must be pertinent or relevant to the issue involved in said judicial proceeding." *Id.* at 52. The Court noted that pertinency and relevance are questions of law. *Id.* at 53 (citing 33 *Am. Jur.* § 150, at 146). Concluding that Trice's statements met these requirements and were absolutely privileged, the Court held that the trial court correctly sustained the demurrer. *Id.* at 54-55.

Although there are no cases in Tennessee directly on point, Pickering relies on cases from other jurisdictions in support of its contention that an absolute privilege applies to reports made by a potential witness in contemplation of litigation. In *Western Technologies, Inc. v. Sverdrup & Parcel, Inc.*, 739 P.2d 1318 (Ariz. Ct. App 1986), the Arizona Board of Regents (Board) retained Western Technologies, Inc. (Western), an engineering firm, to perform testing for a proposed expansion of a stadium. *Id.* at 1319. Western performed the testing, and the expansion was completed in the late 1970s. *Id.* Shortly thereafter, cracks developed in the stadium. *Id.* The Board retained Sverdrup & Parcel, Inc. (Sverdrup), an engineering firm, to investigate the cause of the cracks. *Id.* Sverdrup prepared reports that blamed Western for the structural defects. *Id.* The Board sued a number of parties, including Western, to recover for the expense of repairing the stadium. *Id.* After reaching a settlement with the Board, Western brought suit against Sverdrup for, *inter alia,* injurious falsehood to recover for damages it paid in the settlement and for damages for loss of business. *Id.* at 1319-20. Sverdrup asserted the defense of absolute privilege in its role as an expert witness. *See id.* at 1320-21. The court held that Sverdrup's reports were privileged because the Board was seriously contemplating litigation, the reports were "'a necessary step in taking legal action,'" and the Board actually relied upon the reports in bringing suit. *Id.* at 1322.

Pickering also relies on *General Electric Co. v. Sargent & Lundy*, 916 F.2d 1119 (6th Cir. 1990), in which Kentucky Utilities informed Sargent & Lundy (Sargent), an engineering firm, that it was considering litigation against the firm to recover the costs for repair and redesign of one of Sargent's projects. *Id.* at 1122. Sargent signed a waiver of the statute of limitations and prepared reports blaming Envirotech, a company subsequently purchased by General Electric, for the problems. *Id.* When Kentucky Utilities sued General Electric, GEESI (a wholly owned subsidiary of General Electric), Envirotech, and Sargent, General Electric and GEESI filed cross-claims against Sargent for injurious falsehood. *Id.* at 1123. Sargent then sought to exclude as absolutely privileged the documents and statements it made after executing the statute of limitations waiver because they were made in contemplation of litigation. *Id.* The district court held that the documents and statements were not privileged and that, even if they were privileged, Sargent lost the privilege because the statements were made in furtherance of a fraud. *Id.*

Sargent appealed, and at the time, Kentucky courts had not yet had the opportunity to address whether an absolute privilege applied to statements made preliminary to judicial proceedings. *Id.* at 1126. Noting that Kentucky courts often turned to the provisions of the *Restatement (Second) of Torts* for guidance with respect to the absolute privilege, the court relied on § 587 of the *Restatement (Second) of Torts* in holding that such statements are absolutely privileged if they are made in contemplation of litigation. *Id.* at 1125-26 (citing *Restatement (Second) of Torts* § 587, at 248). Concluding that Sargent's documents and statements met these requirements and were absolutely privileged, the court reversed the district court. *Id.* at 1129. *Accord Kahn v. Burman*, 673 F. Supp. 210 (E.D. Mich. 1987) (holding that witness immunity encompasses reports prepared by witnesses before litigation even though not made under oath because they are relevant to judicial proceedings), *aff'd*, 878 F.2d 1436 (6th Cir. 1989); *Adams v. Peck*, 403 A.2d 840 (Md. Ct. App. 1979) (holding that privilege extends to communications made by witnesses before trial, including a report prepared by a psychiatrist, if related in some way to the pending litigation); *Durand Equipment Co. v. Superior Carbon Products, Inc.*, 591 A.2d 987 (N.J. Super. Ct. App. Div. 1991) (holding that absolute immunity extends to documents used in preparation for judicial proceedings)*; Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc.* 776 P.2d 666 (Wash. 1989) (holding that a report prepared before trial by

an engineer who had been retained as an expert witness was privileged).

Prior to LSSM's hiring of Pickering, FB&D, the general contractor for both projects in Lutheran Village, filed suit against LSSM and MK in the chancery court. As to LSSM, FB&D's complaint seeks, among other things, enforcement of a mechanic's lien and recovery for breach of contract or under quantum meruit. FB&D's complaint also seeks recovery from MK for interference with a contract and for negligent design and supervision of the projects in breach of their contractual duties as architects. Proof was introduced in the instant case that the Pickering firm was hired to provide expert witnesses and to furnish information to LSSM concerning the defects in the construction, any problems with the design, and what entity or entities were responsible for the problem. Pickering was also employed to provide solutions for the existing problems and estimate the cost of correcting the problems. Although Pickering might have had a dual role, it seems clear that the information Pickering furnished was pertinent and relevant to the issues drawn in the chancery court lawsuit and perhaps could constitute essential evidence for LSSM's defense.

MK contends that the Report was unsigned, unsealed, and issued by Pickering in its corporate capacity. We must respectfully disagree with this characterization. The Report is merely an assimilation of the information compiled by various representatives of Pickering in their role as expert witnesses in the chancery court litigation and in anticipation of their upcoming testimony in that proceeding.

In *Jones v. Trice*, 210 Tenn. at 535, 360 S.W.2d at 48, our Supreme Court strongly endorsed a liberal application of the absolute privilege accorded to publication of defamatory matters in connection with judicial proceedings. The Court said:

> Underlying this general doctrine of absolute immunity from liability in libel and slander for statements made in the course of a judicial proceeding is a policy decision by the courts that access to the judicial process, freedom to institute an action, or defend, or participate therein without fear of the burden of being sued for defamation is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of an individual to a legal remedy where he has been wronged thereby.

360 S.W.2d at 51. The Court's reliance in *Jones* on the *Restatement of Torts* also indicates its willingness to extend the doctrine to communications preliminary to proposed or pending litigation. Therefore, we hold that Pickering's Report as published to LSSM is absolutely

12

privileged.

Although we find that a privilege existed, this does not end the inquiry. We must now determine whether the absolute privilege includes MK's actions based upon the procurement or inducement of breach of contract. In ruling on the motion for a judgment notwithstanding a verdict, the trial court relied on two cases: *Lann v. Third National Bank*, 198 Tenn. 70, 277 S.W.2d 439 (1955), and *Middlesex Concrete Products & Excavating Corp. v. Carteret Industrial Ass'n*, 172 A.2d 22 (N. J. Super. Ct. App. Div. 1961). In *Lann*, the plaintiff, a businesswoman, sued the bank for what is termed in her pleadings as interference with and injury to her business. *Lann*, 277 S.W.2d at 440. She alleged in her bill that the bank had made false and defamatory statements in a suit seeking to recover a debt. *Id.* The bill stated that the suit was for "slander of property, based upon the alleged false and defamatory matter obtained in the original bill in a prior case, and . . . moral or business duress based alike on said alleged false and defamatory matter and other facts and circumstances." *Id.* The defendant bank's demurrer to the bill was sustained. On appeal, our Supreme Court held that the averments in the bank's pleadings, although false and malicious, were absolutely privileged because they were made in the course of judicial proceedings and were relevant to those proceedings. *Id.* The Court noted that Lann's action was based in part on tortious interference with her business. *Id.* In affirming the trial court, the Court concluded that "if privileged for one purpose [the statements] must be privileged for all others." *Id.* at 443.

In *Middlesex Concrete Products & Excavating Corp. v. Carteret Industrial Ass'n*, 172 A.2d 22 (N.J. Super. Ct. App. Div. 1961), an engineering firm was retained as a consultant in a pending lawsuit between a construction firm and a city borough arising out of the construction of a sewage treatment plant. *Id.* at 23. The engineering firm performed an investigation, published a report, and testified at trial as an expert witness. *Id.* at 24. The construction firm sued the engineering firm for tortious interference with contractual and business rights and relations. *Id.* at 22. On appeal, the court asserted that "statements made in judicial or *quasi-* judicial proceedings and having some relation thereto are absolutely privileged against a suit for defamation." *Id.* at 25 (citations omitted). The court further asserted that the privilege extended to preliminary conferences and steps taken in preparation of the case for trial. *Id.* The court held that the engineering firm's report, consultations, aid, and advice were rendered as a part of a

judicial proceeding and could not be the basis of a suit for tortious interference because to hold otherwise would circumvent the absolute privilege. *Id.* at 25-26.

Pickering further relies on *Western Technologies, Inc. v. Sverdrup & Parcel*, 739 P.2d 1318 (Ariz. Ct. App. 1986), in support of its argument that MK's claims for inducement to breach of contract are barred by the absolute privilege. In that case, the court addressed whether Western's claim for tortious interference with business was barred by the same absolute privilege that barred its claim for injurious falsehood. *Id.* at 1322. The court asserted that the importance of protecting witnesses from liability arising out of their roles in the judicial process outweighs competing considerations. *Id.* at 1323. The court reasoned that "it would be illogical to hold that the representations . . . made are absolutely privileged in the context of an injurious falsehood action, but that the same representations are not privileged in the context of a suit for contractual interference." *Id.* Thus, the court held that Western's claim for tortious interference was barred by the same privilege that barred the injurious falsehood action. *Id.* at 1324.

In *Lann*, our Supreme Court recognized the extension of the absolute privilege to causes of action other than actions for defamation, and cases from other jurisdictions support such an extension. Therefore, we hold that the absolute privilege afforded a publication of false and defamatory statements in the course of judicial proceedings applies to an action for procurement or inducement of breach of contract based on those false and defamatory statements.

MK also asserts that Pickering's actions, apart from the allegedly defamatory Report, procured or induced the breach of the contracts with LSSM. However, from our review of the record, it appears that a determination by LSSM to terminate the contracts with MK emanated from the information furnished to LSSM in the Report concerning MK's performance of its contracts.

Accordingly, we find that the absolute privilege applies and that the trial court correctly granted a judgment notwithstanding the verdict on the actions based upon the procurement of breach of contract.

In view of our ruling on MK's first two issues, we pretermit MK's third issue.

Pickering's first issue for review is:

> 1. Whether the trial court erred in not granting Pickering's Motion for Directed Verdict on the libel claims that were not excluded by the previous ruling on Pickering's Motion for

14

Summary Judgment.

Pickering first asserts that the trial court erred when it denied Pickering's motion for a directed verdict because there was no publication to Omega or Thompson-White. Pickering's assertion is made in reliance on this Court's holding in *Woods v. Helmi*, 758 S.W.2d 219 (Tenn. App. 1988). In *Woods*, the plaintiff, a certified registered nurse anesthetist, brought suit against her immediate supervisor and others seeking damages for alleged defamation and wrongful interference with employment. *Id.* at 220. The plaintiff and her supervisor were both employed by the Regional Medical Center in Memphis (The Med). *Id.* The Med had a unique arrangement for the operation of its anesthesiology department in that it had its own paid employees and also had physicians provided by the University of Tennessee employed as part of the staff of The Med. *Id.* at 220-21. The plaintiff's supervisor issued a memo concerning operating room behavior of the plaintiff that was sent to persons who "had managerial, supervisory or administrative responsibilities and oversight for [the] internal affairs of The Med's anesthesiology department and were immediately interested in the information transmitted." *Id.* at 222. The Court noted that communication of defamatory matter between the agents and officers of the corporation in the ordinary course of business is not a publication. *Id.* (citing *Freeman v. Dayton Scale Co.*, 159 Tenn. 413, 19 S.W.2d 255 (Tenn. 1929)). In this vein, the Court said:

> While many of the cases denying the existence of a publication speak in terms of corporations communicating to or with itself, it seems to this Court that more essential to the issue is the concept of "need to know," with the communication flowing through the proper chain of command, particularly in employee performance reviews or disciplinary action. It could readily be argued that the concept of intra-corporate communications would not apply if, in the case of a review by corporate superiors of the alleged misconduct of a branch manager, the circumstances surrounding his misconduct were communicated also to the corporation's truck driver or janitor, who obviously would not be in the "need to know" pipeline.

*Id.* at 223.

Pickering asserts that disseminating the report to Omega and to Thompson-White was necessary because they had a "need to know" in order to perform their function for LSSM. We believe Pickering's reliance on *Woods* is misplaced. In *Woods*, the dissemination of the alleged defamatory material was made within a particular managerial structure, albeit one involving two

15

different entities. In the case at bar, the publication of the defamatory material was made to separate entities and clearly would not fall within the rule established by *Freeman v. Dayton Scale*, 159 Tenn. at 413, 19 S.W.2d at 255. Pickering communicated the defamatory statements to the distinct entities of Omega and Thompson-White. Communicating a defamatory statement to a third person establishes the element of publication for a libel claim. *Little Stores v. Isenberg*, 26 Tenn. App. 357, 172 S.W.2d 13 (Tenn. App. 1943). This argument is without merit.

Pickering next asserts that the absolute privilege afforded to the communication to LSSM could also be afforded to Thompson-White and Omega because they had a legal necessity for the Report as co-witnesses for LSSM in the chancery court lawsuit. We must respectfully disagree. The primary role of Omega was to complete the work necessary to finish the projects, and the primary job for Thompson-White was to market the projects. LSSM retained Pickering to determine cause and effect, thus Pickering's Report to LSSM for use in the defense of the chancery lawsuit was in furtherance of that legal proceeding. However, the publication of the Report to Omega, the contractor employed to finish the project, and Thompson-White, the marketing entity, was not related to the legal proceedings in the chancery court. Therefore, the trial court correctly ruled that there was no privilege in the publication of the Report to Omega and Thompson-White.

Pickering next asserts that the essential elements of libel were not proven. Pickering states in its brief:

> Pursuant to the Tennessee Pattern Jury Instructions, the following are the elements for libel: 1) the defendant communicated to persons other than the plaintiffs a statement through its April 15, 1991 Report concerning the plaintiffs that was a libel as that term [is] defined in the instructions; 2) the defendant was guilty of negligence in failing to determine the truth of the statement prior to communicating it or that the defendant communicated the statement with knowledge that it was false; 3) the libel was read or heard by persons other than the plaintiffs, who understood its libelous meaning and that it referred to the plaintiffs; and 4) the plaintiffs were injured by the communication of the libel; and 5) the statement about the plaintiffs was false. (See T.P.I. - Civil - 7.02).

We agree that Pickering correctly states the law. Pickering specifically argues that MK failed to prove the third element and the fourth element. The third element requires that a third person read the publication and understand its libelous meaning and that the publication refers

16

to the plaintiff.  Pickering argues that although it is conceded that Omega received a copy of the Report, there is no proof that any one at Omega read the Report or understood its libelous meaning and that this holds true also for Thompson-White.  However, the record indicates that Omega received the Report for its use in bidding on the project for completion of Lutheran Village and that Thompson-White received the Report in connection with its marketing efforts for both projects.  The record further indicates that during the course of the corrective construction work, periodic meetings were held in which the Report was referred to concerning the remedial work required.  This record has ample proof that Omega and Thompson-White read the Report and relied on its many false statements concerning defective design and code violations to finish the projects.  Moreover, whether Omega and Thompson-White understood the defamatory meaning of the Report was a question for the jury.  *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978).  This argument is without merit.

Pickering also asserts that the fourth element of libel is not present because MK failed to prove any damages resulting from the alleged defamatory statements communicated to Omega and Thompson-White.  Without going into detail on all of the damages, the jury awarded MK recovery for emotional distress resulting from the publication of the false and defamatory statements.  Certainly each publication would result in additional emotional distress, and there is material evidence that could indicate emotional distress resulting from the communication of the defamatory statements to Omega and Thompson-White.

Accordingly, the trial court correctly denied Pickering's motion for a directed verdict on the libel claims that were not excluded by the previous ruling on Pickering's motion for summary judgment.

In its second issue, Pickering asserts that the trial court erred in not ruling that the damages awarded by the jury on the libel claims were excessive.  If there is any material evidence to support the award of damages, we must affirm the judgment.  T.R.A.P. 13(d).  In making this determination, every reasonable inference must be drawn in favor of MK.  *Moore v. Bailey*, 628 S.W.2d 431, 434 (Tenn. App. 1981) (citations omitted).

Under Tennessee law, a plaintiff is required to prove actual damages in all defamation cases.  *Handley v. May*, 588 S.W.2d 772, 776 (Tenn. App. 1979).  The actual damage requirement was discussed by the United States Supreme Court in *Gertz v. Robert Welch, Inc.*,

17

418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974):

> We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

*Id.* at 349-50, 94 S. Ct. at 3012. The failure to prove special damages or out-of-pocket losses is not necessarily determinative. *Handley*, 588 S.W.2d at 776. The issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering. *Id.*

The amount of damages assessed depends on the degree of moral turpitude of the defendant's conduct. *Saunders v. Baxter*, 53 Tenn. (6 Heisk.) 369, 385 (1871). Absence of malice may be shown by the defendant's retraction of the libel to mitigate the damages. *See Knoxville Publ'g Co. v. Taylor*, 31 Tenn. App. 368, 375, 215 S.W.2d 27, 30 (1948). Unless "actual malice" is shown, punitive damages are not permitted. *Memphis Publ'g Co.*, 569 S.W.2d at 421. A refusal to retract after a request for retraction is made or the republication after notice is given of the falsity of the statements is evidence of malice. *See e.g.*, *Vigil v. Rice*, 397 P.2d 719 (N.M. 1964) (holding that refusal to retract defamatory statements is evidence of malice to destroy a qualified privilege); *Morgan v. Dunn & Bradstreet, Inc.*, 421 F.2d 1241 (6th Cir. 1970) (holding that republication after knowledge of the falsity of the defamatory statements is sufficient evidence of malice to support punitive damages). In *Handley v. May*, 588 S.W.2d 772 (Tenn. App. 1979), this Court considered whether there was any material evidence on the issue of damages to submit an action for slander to a jury. *Id.* at 776. The plaintiff's tax returns showed that she did not suffer any lost revenues to her business after the alleged slander was uttered. *Id.* Asserting that the failure to prove out-of-pocket loss was not dispositive, the Court examined the record for evidence of actual harm. *Id.* The evidence indicated that the plaintiff was under mental stress independent from the slander, that the slander "was quite upsetting" to the plaintiff, and that she was unable to concentrate in her business. *Id.* at 776-77. Because "mere annoyance or loss of peace of mind do not constitute recoverable special

damages," the Court held that there was no material evidence on the issue of damages. *Id.* at 777.

In *Moore v. Bailey*, 628 S.W.2d 431 (Tenn. App. 1981), this Court considered whether an award of compensatory and punitive damages for defamation was excessive. *Id.* at 434. In that case, the defendant made accusations about the plaintiff, a county environmentalist for the Tennessee Department of Public Health, to the state inspector general and to the plaintiff's supervisor. *Id.* at 432. The plaintiff sued the defendant for slander, and the jury returned a verdict in favor of the plaintiff and awarded $1,000.00 in compensatory damages and $5,000.00 in punitive damages. *Id.* at 433. The defendant appealed the jury verdict, asserting that there was no material evidence to support the recovery of compensatory or punitive damages. *Id.* at 434. The Court pointed out that the plaintiff put on proof from which a jury could find he suffered minimal out-of-pocket loss because of lost time from work and lost vacation time and incurred expenses in traveling to respond to the charges made by the defendant. *Id.* The Court further pointed out the jury could find from the plaintiff's own testimony that he suffered humiliation and mental anguish as a result of the defendant's actions. *Id.* Thus, the Court concluded that there was material evidence to support the jury awards. *Id.*

Under the principles above, we must determine whether there is material evidence to support the amounts awarded by the jury on the libel claims, which included $150,000.00 for emotional distress, $250,000.00 for pecuniary losses, $200,000.00 for injuries to MK's reputation, and $100,000.00 for punitive damages.[5]

The record is replete with testimony concerning the emotional distress that Myers and Klimek suffered as a result of the Report. Myers testified that he spent forty years of his life building his reputation in the architectural business and that the statements in the Report devastated and humiliated him and caused him to become severely depressed. Klimek also testified that the statements in the Report caused him great distress. Although this testimony related to the original publication of the Report, it is reasonable to infer that MK suffered the

---

[5] We note that the verdict in this case is a joint verdict, which does not comply with T.C.A. § 25-1-104 (1980) requiring that the verdict state separately the amount awarded to each plaintiff. From our review of the record, it appears that this requirement has been waived. *See Pridemark Custom Plating v. Upjohn Co.*, 702 S.W.2d 566, 574 (Tenn. App. 1985).

same emotional distress from each publication of the Report, including the publication to Omega and Thompson-White. Under the principles above, there is material evidence to support the amount awarded for emotional distress.

As for the $250,000.00 awarded by the jury for pecuniary losses, MK points out that it is no longer in existence and that Myers and Klimek are no longer practicing architecture. However, there is no evidence that this was a result of the publication of the Report to Omega and Thompson-White and not a result of the publication of the Report to LSSM. There is also no evidence that MK suffered any pecuniary losses or lost any potential business opportunities with Omega or Thompson-White by virtue of the publication of the Report to those entities. There is no material evidence in the record to support this award.

The jury further awarded MK $200,000.00 for the injuries to its reputation as a result of the publication to Omega and Thompson-White. The only evidence in the record with respect to any possible injury to MK's reputation is Melvin O'Brien's testimony that the publication of such a report would injure an architect's reputation. However, there is no testimony or evidence in the record establishing that MK actually suffered injuries to its reputation as a result of the publication to Omega and Thompson-White. After reviewing the record, we conclude that the evidence indicates that the injury MK suffered to its reputation, if any, resulted from the privileged communications of the Report, MK's replacement by Pickering as project architect, and MK's termination by LSSM. There is no material evidence to support this award.

The jury also awarded $100,000.00 in punitive damages to MK on the libel claims. The record indicates that MK requested that Pickering correct the errors or retract the defamatory statements in the Report, but that Pickering failed to do as MK requested. This is sufficient evidence of Pickering's actual malice to support the jury award of punitive damages.

Under the principles above, we conclude that there is no material evidence to support the $200,000.00 awarded to MK for injuries to its reputation or the $250,000.00 awarded to MK for pecuniary losses, but that there is material evidence to support the $150,000.00 awarded for emotional distress and the $100,000.00 awarded as punitive damages.

Because of our conclusion that the absolute privilege bars MK's claims for inducement of breach of contract, Pickering's third issue is pretermitted.

Accordingly, the trial court's judgment on the jury verdict is modified to award MK

20

$150,000.00 compensatory damages and $100,000.00 punitive damages. As modified, the judgment on the jury verdict is affirmed. The order of the trial court granting a judgment notwithstanding the verdict to Pickering on the causes of action for inducement or procurement of breach of contract is affirmed. Costs of appeal are assessed one-half to appellants and one-half to appellees. The case is remanded to the trial court for such further proceedings as may be necessary.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**DAVID R. FARMER, JUDGE**

_____
**HEWITT P. TOMLIN, JR.,**
**SENIOR JUDGE**