# IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

_____

| | |
|---|---|
| **CRYE-LEIKE REALTORS, INC.,** ) | Shelby County Chancery Court |
| **A Tennessee Corporation**, ) | No. 104720-3 R.D. |
| ) | |
| Plaintiff/Appellant. ) | |
| ) | |
| VS. ) | C.A. No. 02A01-9711-CH-00287 |
| ) | |
| **WDM, INC., a subsidiary of DERLAN**, ) | |
| **INDUSTRIES LIMITED, and** ) | |
| **GEORGE C. RICHERT, TRAMMELL** ) | |
| **CROW SE, INC. and SCOTT** ) | |
| **PAHLOW**. ) | |
| ) | |
| Defendants/Appellees. ) | |
| ) | |

**FILED**

**September 23, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Chancery Court of Shelby County at Memphis.
**Honorable D. J. Alissandratos, Chancellor**

**Roger A. Stone**, STONE, HIGGS & DREXLER, Memphis, Tennessee
Attorney for Plaintiff/Appellant.

**Anthony Sammons**, BRANSON & BEARMAN, PLLC, Memphis, Tennessee
Attorney for Defendants/Appellees WDM, Inc. and George C. Richert.

**William L. Hendricks, Jr.**, GLANKLER BROWN, PLLC, Memphis, Tennessee
Attorney for Defendant/Appellee Trammell Crow SE, Inc.

OPINION FILED:

**REVERSED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J.,W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

In this action for breach of contract and procurement of breach of contract, Plaintiff Crye-Leike Realtors, Inc., appeals the trial court's final order entering summary judgment in favor of Defendants/Appellees WDM, Inc., George C. Richert, Trammell Crow SE, Inc., and Scott Pahlow. We reverse the trial court's judgment because we conclude that the record reveals the existence of genuine issues of material fact which preclude summary judgment on these claims.

On November 10, 1993, George C. Richert and Colman Borowsky executed a Buyer's/Tenant's Agreement under which Richert appointed Borowsky, a real estate broker with Crye-Leike Realtors, Inc., as his sole and exclusive real estate broker to aid him in the leasing and/or acquisition of industrial property. In executing the agreement, Richert agreed to inform Borowsky of any property of which he became aware in order for Borowsky to contact the owner or the owner's broker. Richert also agreed that, if he entered into any lease or purchase agreement within twenty-four months after the period of the agreement, Richert would recognize and provide for Borowsky as the broker in the transaction. The agreement provided for an initial term of twelve months but could be terminated by either party upon thirty days written notice.

At the time they executed the agreement, the parties understood that Richert was representing a company called Derlan Industries and that they would be relying on Derlan's credit report to secure a lease. They also understood, however, that Richert would be forming a new corporation which would actually acquire the property. Richert informed Borowsky that the newly-formed company would use the space to assemble and distribute pumps. To this end, the agreement provided that the purpose of the industrial property was "to manufacture, test and distribute pumping equipment." Richert represented that he would be the chief executive officer of the new company and that he would have the authority to execute agreements on its behalf. Because the corporation was not yet in existence, however, Richert signed the agreement in his individual capacity. Borowsky signed the agreement on behalf of Crye-Leike.

In accordance with the agreement, Borowsky began attempting to locate suitable space for Richert's business. Based upon specifications provided by Richert, Borowsky prepared some sketches of the type of space Richert desired. Borowsky then sent out a request for proposals to prospective bidders. Borowsky kept a list of about fifty to sixty commercial real estate industrial

brokers whom he regularly contacted, and he contacted many of these brokers by telephone to discuss Richert's space needs. In late November or early December 1993, Borowsky learned that the name of Richert's new company would be WDM, Inc.

On December 7, 1993, Richert formed WDM, Inc. Initially, Richert and two other people owned all of WDM's stock. They later sold the stock to E.G. Corporacion. The principal stockholder of E.G. Corporacion was Derlan Industries. Richert became WDM's president and chief executive officer.

Sometime in December 1993, Borowsky showed Richert a potential space at Interstate Industrial Park off of Brooks Road in Memphis. Borowsky subsequently prepared a written offer to lease the space and submitted it to Belz Enterprises. The offer was made on behalf of WDM, Inc., and Richert signed the offer as WDM's president. Borowsky and Belz employees proceeded to negotiate the terms of the proposed lease agreement. Borowsky believed that a lease agreement with Belz was "a done deal." When the deal was not consummated as planned, however, Borowsky became concerned that Richert and WDM were "bailing out" on him. At some point, Borowsky began to suspect that Richert was instead dealing with Trammell Crow SE, Inc. Accordingly, Borowsky telephoned his contact at Trammell Crow, Brad Kornagey, and reminded him that Crye-Leike had an exclusive agreement with Richert. Borowsky previously had contacted Kornagey in an effort to find suitable space for Richert and WDM.

Richert indeed had contacted Trammell Crow to inquire about space in a facility named Bellbrook Business Park. Borowsky had suggested showing this space to Richert in early December 1993, but Richert claimed not to be interested in the space at that time. When he contacted Trammell Crow, Richert informed its leasing agent, Scott Pahlow, that Richert and WDM were being represented by Borowsky and Crye-Leike. Pahlow did not inquire as to the details of Borowsky's representation, however, and, specifically, he did not ask if a contract existed between Richert and Borowsky, although he knew that brokers attempted to get their clients to sign such contracts. Pahlow also was not informed by his coworker, Brad Kornagey, about the existence of such a contract, despite the fact that they both attended weekly sales meetings at which agents discussed what deals they were working on.

On February 22, 1994, Richert, on behalf of WDM, executed a lease agreement with Memphis Zane May Associates for space in the Bellbrook Business Park on Fleetbrook Drive. The lease agreement described WDM as a wholly-owned subsidiary of Derlan Industries. Neither Borowsky nor Crye-Leike received a commission from the lease transaction. According to Richert, Pahlow advised him that Borowsky did not need to be involved in the transaction because Borowsky neither had shown Richert the Bellbrook property nor had contacted Pahlow about the property.

By letter dated February 23, 1994, Richert terminated his agreement with Crye-Leike and Borowsky. Richert wrote the letter on WDM stationary, and he signed the letter on behalf of WDM as its president and chief executive officer. Some time after receiving the termination letter, Borowsky learned about the lease transaction handled by Pahlow for the Bellbrook property. Consequently, Crye-Leike filed this action for breach of contract against WDM and Richert. Crye-Leike later amended its complaint to assert a claim for procurement of breach of contract against Pahlow and Trammell Crow. All of the Defendants filed motions for summary judgment, which were granted by the trial court. This appeal followed.

Summary judgment is appropriate only when the parties' "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R.C.P. 56.04. In determining whether or not a genuine issue of material fact exists for purposes of summary judgment, the trial court is required to consider the question in the same manner as a motion for directed verdict made at the close of the plaintiff's proof. *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). That is, "the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Id*. at 210-11.

This appeal first requires us to determine whether the record contains evidence to support Crye-Leike's claim that WDM ratified or adopted the November 10, 1993, agreement between Richert and Crye-Leike. A corporation may become liable on a preincorporation contract executed by its promoter if the corporation subsequently ratifies or adopts the contract. *Equitec Real Estate Investors Fund XII v. Poplar Pike, Inc.*, No. 02A01-9506-CH-00127, 1996 WL 460269, at

*7 (Tenn. App. Aug. 15, 1996) (citing *Kemmons Wilson, Inc. v. Allied Bank of Texas*, 836 S.W.2d 104, 109 (Tenn. App. 1992)); 18 C.J.S. *Corporations* § 71b (1990). Ratification is the express or implied adoption and confirmation by the corporation of a contract entered into on the corporation's behalf by a promoter who purported to have the authority to act as the corporation's agent. *Bells Banking Co. v. Jackson Centre, Inc.*, 938 S.W.2d 421, 427 (Tenn. App. 1996). In order for a ratification to occur, the corporation, having full knowledge of the facts, must accept the benefits of the promoter's contract. *Id.* (citing 2A C.J.S. *Agency* § 71 (1972)). Moreover, the corporation, either by the circumstances or by its affirmative election, must indicate an intention to adopt the contract as its own. *Id*.

Applying the foregoing standard, we conclude that a genuine issue of material fact exists as to whether WDM ratified or adopted the preincorporation contract entered into between Richert and Crye-Leike. The record contains evidence that, after it was incorporated on December 7, 1993, WDM began to receive the benefits of Richert's contract with Crye-Leike. For purposes of these summary judgment proceedings, it was undisputed that Borowsky continued to search for suitable property for WDM to conduct its business. These efforts included contacting various landlords and other brokers, showing different properties to WDM, and, on at least one occasion, preparing an offer to lease space on behalf of WDM.[1] The corporation also had full knowledge of the facts in this case because Richert, WDM's president and chief executive officer, had full knowledge of the contract executed by Richert and of Borowsky's subsequent efforts to find suitable space for WDM. Finally, the record contains evidence that the corporation intended to adopt the contract. Pursuant to the contract, in January 1994 Borowsky submitted an offer to Belz Enterprises on behalf of WDM for the lease of industrial space. Richert signed the offer on behalf of WDM, Inc., as the corporation's president. This evidence supports Crye-Leike's claim that WDM ratified or adopted the contract after its incorporation and that, in actuality, Borowsky was representing WDM, and not Richert.

In defending the trial court's summary judgment, WDM and Richert contend that

---

[1]Contrary to WDM's and Richert's argument on appeal, we conclude that these efforts resulted in a direct, tangible benefit to WDM, despite the fact that the efforts did not result in the execution of a lease. Crye-Leike, through Borowsky, contracted to provide its services and did provide services. As a realtor, it is in the business of providing services.

Richert's knowledge of the facts could not be imputed to WDM and that, upon becoming a corporate officer, Richert could not ratify his prior actions as a promoter. We conclude that this argument is without merit. Although, as a general rule, the knowledge of a single promoter cannot be imputed to the corporation, exceptions to this rule have been found "where the promoters become directors and stockholders in the corporation or are the sole or controlling stockholders." 18 Am. Jur. 2d *Corporations* § 127 (1985) (footnotes omitted). Moreover, we can find no suggestion in the record that anyone in authority at WDM was unaware of the pertinent facts in this case. The only evidence in the record indicates that, during all times relevant hereto, Richert had authority to act on the corporation's behalf and to bind the corporation.

We also reject the Defendants' contention that WDM could not ratify or adopt the contract with Crye-Leike because Richert signed the contract in his individual capacity and not on behalf of the corporation. This argument was rejected by the court in *In re Dynamic Enterprises, Inc.*, 32 B.R. 509 (M.D. Tenn. 1983). In that case, the plaintiff and the individual defendant, Martin J. Bloeman, signed an agreement which granted Bloeman an exclusive franchise to operate a fitness center in Jackson, Michigan, under the trade name "Fitness World." The agreement contained signature lines for the plaintiff and for the Fitness World franchisee. Bloeman signed the agreement as the guarantor of Fitness World's obligations, but the Fitness World signature line remained blank because Bloeman's corporation, Fitness World of Jackson, Inc., had not yet been formed on the date the agreement was finalized. After its incorporation, Fitness World of Jackson, Inc., proceeded to operate Fitness World in accordance with the provisions of the franchise agreement. *In re Dynamic Enters.*, 32 B.R. at 513-15.

Applying Michigan law, the court first discussed the concept of ratification in deciding whether the franchise agreement was enforceable against the corporation:

> Subsequently formed corporations are not automatically and irreversibly bound, . . . by the acts of promoters and incorporators. Individuals risk that their actions will not be ratified and that personal liability will ensue. The court must scrutinize the actions of the corporate entity following incorporation to determine whether that corporation should be held liable on the particular contract. The Michigan Supreme Court noted in *Johnson & Carlson v. Montreuil's Estate*:

American courts generally hold that a contract made by the promoters of a corporation on its behalf may be adopted, accepted or ratified by the corporation when organized, and that the corporation is then liable, both at law and in equity, on the contract itself, and not merely for the benefits which it has received.

291 Mich. 582, 289 N.W. 262, 264 (1939). If the corporation recognizes the existence of the contract and accepts the benefits bestowed under the contract, equity demands that the corporation also share the liabilities.

*Id*. at 515-16.

The court then held that, despite the absence of the corporate signature on the franchise agreement, Fitness World of Jackson, Inc., was bound by the agreement. The court reasoned:

Postincorporation, Fitness World of Jackson, Inc. affirmed and ratified the franchise agreement. Fitness World operated under the guidelines established in the franchise agreement. Fitness World tendered payments and license fees by checks drawn on a corporate account, accepted goods, advertising and other services and substantially complied with other terms of the franchise agreement. Fitness World never sought to reject the contract and instead operated consistent with the agreement. These acts constitute ratification and adoption of the preincorporation contract. . . . Despite the absence of the corporate signature on the franchise agreement, Fitness World of Jackson, Inc. is bound by the agreement.

*Id*. at 516 (citations omitted).

The record in the present case contains evidence that WDM accepted the benefits of the contract between Richert and Crye-Leike. As previously discussed, these benefits consisted of Borowsky's continued efforts to locate suitable space for WDM to conduct its business. The record contains no evidence that WDM ever sought to reject the contract or the benefits it received thereunder. When Borowsky submitted a lease proposal to Belz Enterprises, Richert signed the proposal on behalf of WDM as the corporation's president. Even when Richert sent the letter to Borowsky notifying him that the agreement was being terminated, Richert used WDM stationery and signed the letter as WDM's president and chief executive officer. We conclude that this evidence of WDM's ratification of the contract was sufficient to withstand the Defendants' motions for

summary judgment on Crye-Leike's breach of contract claim, despite the fact that Richert signed the contract in his individual capacity rather than in his capacity as an officer of the to be formed corporation.

Having concluded that a genuine issue of material fact exists as to whether WDM ratified the preincorporation agreement signed by Richert, we next must determine whether the trial court erred in granting summary judgment in favor of Trammell Crow and Pahlow on Crye-Leike's claim for procurement of breach of contract. In order to recover for procurement of a breach of contract, Crye-Leike was required to prove the following elements: (1) that a legal contract existed between Crye-Leike and a third party, such as Richert or WDM; (2) that Pahlow knew of the contract's existence; (3) that Pahlow intended to induce a breach of the contract; (4) that Pahlow acted maliciously; (5) that the contract was breached; (6) that Pahlow's conduct caused the breach; and (7) that Crye-Leike suffered damages as a result of the breach. *Myers v. Pickering Firm*, 959 S.W.2d 152, 158 (Tenn. App. 1997).

As with Crye-Leike's breach of contract claim, we conclude that genuine issues of material fact precluded an award of summary judgment in favor of Trammell Crow and Pahlow on Crye-Leike's claim for procurement of breach of contract. The record contains evidence (1) that Richert and Crye-Leike entered into a contract which later was ratified by WDM; (2) that Pahlow knew Richert was being represented by Borowsky of Crye-Leike; (3) that Pahlow informed Richert he would not have to involve Borowsky in the transaction because Pahlow, and not Borowsky, showed the leased property to Richert; (4) that Richert and WDM breached the contract with Crye-Leike by executing a lease agreement through Pahlow and Trammell Crow; and (5) that Borowsky and Crye-Leike were paid no commission for the transaction.

In asking this court to uphold the trial court's grant of summary judgment in its favor, Trammell Crow contends that the record contains no evidence that Pahlow had knowledge that a contract existed between Richert and Crye-Leike. We note, however, that Pahlow's actual knowledge of the existence of a contract between Richert and Crye-Leike was not essential to Crye-Leike's claim for procurement of breach of contract. In order to satisfy the knowledge requirement, Crye-Leike only was required to show that Pahlow "had knowledge of such facts and circumstances

that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it." ***Exxon Corp. v. Allsup***, 808 S.W.2d 648, 656 (Tex. Ct. App. 1991); 86 C.J.S. ***Torts*** § 62 (1997). In the present case, Pahlow was notified by Richert that he was being represented by Borowsky of Crye-Leike. In addition to knowing that Borowsky already represented Richert, Pahlow knew that brokers usually attempted to get their clients to sign agreements with them. Despite this knowledge, Pahlow did not inquire further as to the relationship between Richert and Borowsky or the possibility of an existing contract between Richert and Crye-Leike. Based on this evidence, we conclude that a genuine issue of material fact exists as to whether Pahlow had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of a contract between Richert and Crye-Leike.

We likewise reject Trammell Crow's argument that Crye-Leike's evidence fails to support the malice requirement of the tort of procurement of breach of contract. In this context, "malice is 'the wilful violation of a known right.'" ***Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distrib. Co.***, 1986 WL 622, at *6 (Tenn. App. Jan. 2, 1986) (quoting 45 Am. Jur. 2d ***Interference*** § 3), ***modified on other grounds***, 734 S.W.2d 322 (Tenn. 1987). Contrary to Trammell Crow's argument, Crye-Leike was not required to show that Pahlow felt ill will toward Borowsky and Crye-Leike. It was sufficient if the evidence showed that Pahlow's conduct was intentional and without legal justification. ***Hutton v. Watters***, 179 S.W. 134, 135 (Tenn. 1915); 86 C.J.S. ***Torts*** § 62 (1997). Interference is without justification if it "is done for the indirect purpose of injuring the plaintiff ***or*** benefiting the defendant at the plaintiff's expense." ***Bismarck Realty Co. v. Folden***, 354 N.W.2d 636, 642 (N.D. 1984) (emphasis added). Here, Crye-Leike presented evidence that Pahlow knew Richert was being represented by Borowsky and, thus, that Borowsky expected to earn a commission from Richert's and WDM's future lease of property. Rather than inquiring into the nature and extent of this relationship, Pahlow advised Richert that Borowsky would not be involved in the transaction because Borowsky did not show the subject property to Richert. Pahlow then proceeded to conduct a lease transaction which benefited himself and Trammell Crow at the expense of Borowsky and Crye-Leike. We conclude that this evidence was sufficient to withstand the motions for summary judgment filed by Trammell Crow and Pahlow.

The trial court's judgment is reversed, and this cause is remanded for further

proceedings consistent with this opinion. Costs of this appeal are taxed to the Defendants, for which execution may issue if necessary.

                                              _____

                                              FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
LILLARD, J. (Concurs)