IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 1, 2003 Session

**SHAWN E. MCWHORTER v. RANDALL BARRE**

**Appeal from the Circuit Court for Hamilton County**
**No. 00-C-1083     W. Neil Thomas, III, Judge**

**Filed August 29, 2003**

**No. E2002-02896-COA-R3-CV**

Professional pilot Shawn E. McWhorter ("Plaintiff") sued Randall Barre ("Defendant") for defamation based upon a letter Defendant wrote to the Federal Aviation Administration ("FAA") containing allegations that Plaintiff was medically unfit to be a pilot. The jury returned a verdict for Plaintiff and awarded $25,000 in compensatory damages and $42,500 in punitive damages. The Trial Court entered its judgment, as later amended, in favor of Plaintiff against Defendant for $105,820.01, consisting of compensatory damages of $25,000, punitive damages of $42,500, and attorney fees and expenses in the amount of $38,320.01. The Trial Court's award of attorney fees and expenses was based upon Defendant's refusal to admit liability in response to requests for admission. Defendant appeals. We affirm, in part, and reverse, in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, in part, and Reversed, in part; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Michael E. Richardson, Chattanooga, Tennessee, for the Appellant, Randall Barre.

James R. McKoon, Chattanooga, Tennessee, for the Appellee, Shawn E. McWhorter.

# OPINION

## Background

Plaintiff sued Defendant in May of 2000, for defamation and outrageous conduct. Defendant filed his answer and a counterclaim. Defendant later filed a motion for summary judgment. The Trial Court held in a memorandum opinion that Defendant's Letter was a conditionally privileged communication. The Trial Court further found there was no evidence that Defendant acted with malice so as to lose the conditional privilege. The Trial Court then entered its order granting Defendant summary judgment. Plaintiff filed a motion to alter or amend the Trial Court's summary judgment, and also filed a brief arguing that the determination of whether Defendant acted with actual malice was a question of fact that was in dispute and, therefore, summary judgment was improper. The Trial Court granted Plaintiff's motion to alter or amend and held that an issue of fact existed as to both the truth of the publication and as to whether it was published with malice. The Trial Court set aside the summary judgment granted to Defendant. The case then proceeded to trial.

Plaintiff testified that he is the chief pilot employed by Covenant Transport ("Covenant"). Plaintiff pilots a Beechjet 400A, a light corporate jet, for Covenant. The Beechjet 400A carries seven passengers and is used to transport Covenant executives and their families. Plaintiff, who was 41 years old at the time of trial, has flown commercially since he was 19 years old. During the course of his career, Plaintiff has flown for several corporations and at the age of 24 was the youngest captain at Atlantic Southeast Airlines. Plaintiff also has been an instructor at several different flights schools. Plaintiff testified that during the course of his career he had flown several people of notoriety including "ex-governor Whitfield Dunn, present governor Don Sunquist, celebrity Don Douglas who was in the Beverly Hillbillies, Derrick Coe, race car driver, first former lady [sic] Barbara Bush and some other movie stars . . . ." At the time of trial, Plaintiff had been a pilot for Covenant for four years.

Plaintiff testified that his flying record is important to him as a professional pilot. Prior to April of 2000, Plaintiff had no regulatory complaints, medical problems, or any blemishes on his flying record. Plaintiff testified that as a pilot, he is regulated by the FAA and by the National Transportation Safety Board ("NTSB"). He is required to have yearly physicals by a designated FAA medical examiner and, because he is over the age of 40, also is required to have EKG's. If Plaintiff failed to meet any of the medical requirements, he would be grounded. Plaintiff testified that federal law imposes a duty upon flight crew members to report immediately the inability of a crew member either to perform his job function or to carry out his duties due to illness or medical problems. Plaintiff testified that the law requires this notification be made to the nearest NTSB field office in the United States immediately upon landing. The Trial Court took judicial notice of the federal regulations to which Plaintiff referred, 49 CFR § 830.5.

From August or September of 1998 until February of 2000, Defendant worked for Covenant as Plaintiff's co-pilot. Plaintiff and Defendant had flown together previously for another

company. On all of the flights Plaintiff and Defendant flew together, Plaintiff was always the pilot in command and Defendant was always the co-pilot. Plaintiff fired Defendant in February of 2000.

A couple of months after he was fired, Defendant wrote a letter ("Letter") to the Office of Aviation Medicine in Oklahoma City stating he had flown with Plaintiff and was reporting the following regarding Plaintiff:

> He has demonstrated a marked personality change in the last six months.
> He has frequent headaches requiring ibuprofen in large amounts (I have seen him take four 800 mg tablets at a time and he has reported taking as many as ten).
> He falls asleep in the cockpit for periods of two to ten minutes. I have witnessed at least ten such episodes.

In the Letter, Defendant also states "If [Plaintiff] were to present in my office prior to my retirement [as a physician] with the above noted problems, I should be obliged to perform at least a neurological examination, EEG and some type scan to assure he has no condition which would cause him to be permanently incapacitated in flight." Defendant composed the Letter at approximately 2 a.m. on his home computer and signed it as the "Former Chief of Neurology, St Lukes Hospital."

In April of 2000, Plaintiff received a letter from the FAA stating they had "recently received information which indicates a reasonable basis to believe that your [sic] may not meet the medical standards prescribed in Part 67 of the Federal Aviation Regulations (FARs)." The FAA letter grounded Plaintiff from flying and requested that Plaintiff obtain and submit "complete reports of any/all information regarding headaches and/or sleep problems" from his attending physicians and treating hospitals. The FAA letter also requested that Plaintiff submit a current neurological evaluation. When Plaintiff received the letter from the FAA, he was unaware of Defendant's Letter. After receiving the FAA letter, Plaintiff immediately notified his supervisors at Covenant that he had been grounded and cancelled a flight he was scheduled to fly the next day. Plaintiff testified he felt "[v]ery embarrassed" having to tell his employers at Covenant the FAA had grounded him.

On the next business day, Plaintiff drove to Nashville and met with several FAA inspectors. Plaintiff told the inspectors that he had recently fired a co-pilot and since that time had been "the subject of several suspicious attacks directed against my personal property and my reputation." Plaintiff was not aware of Defendant's Letter, but had his suspicions as to the source of the complaints to the FAA. As a result of this meeting, Plaintiff temporarily was cleared to fly, but was required to obtain letters from each of the FAA designated medical examiners who had given Plaintiff physicals during the course of his career and from other pilots who had flown with Plaintiff in the past. Plaintiff also was required to undergo a neurological exam. After meeting with the FAA inspectors, Plaintiff requested a copy of his FAA file, which contained a copy of Defendant's Letter.

Plaintiff then contacted the medical examiners and other pilots, explained the situation to them, and requested letters from them vouching for him. During these conversations,

Plaintiff was required to disclose the circumstances of his FAA grounding including the allegations in Defendant's Letter. Plaintiff testified it was "very embarrassing" for him to have to tell his fellow pilots he had been grounded. Plaintiff also testified that the community of pilots is "very close knit" and that they "rely on one another" to gain information about other pilot's records. Plaintiff stated "if you fly anywhere in this region, in the Southeast region, everybody knows everyone. We've all been recycled to one degree or another in this industry and we all know one another." Plaintiff testified that his "reputation as a professional pilot has been tarnished."

Covenant also investigated the allegations in Defendant's Letter. Plaintiff was required to have two meetings with personnel from human resources and was told to comply with the FAA requests. Covenant also instructed Plaintiff to undergo a neurological exam.

The charges alleged in Defendant's Letter were resolved with the FAA. Plaintiff testified "[i]t took three months, but they finally resolved it. I got a clearing letter from Oklahoma City."

Plaintiff testified he suffered both embarrassment and stress as a result of Defendant's Letter. Plaintiff testified he gained a lot of weight as a result of the stress and that he no longer was a "very laid back, easygoing person." Plaintiff stated that "even though the FAA has cleared me of this, there will always be this blemish on my record."

Plaintiff also testified regarding his out-of-pocket costs caused by the Letter. He testified that the neurological exam he was required to have cost $200 and that he spent money on long-distance phone calls and his trip to Nashville to meet with the FAA inspectors. Plaintiff admitted, however, that Covenant paid the cost of the neurological exam and that "[i]t would be impossible" to figure out the cost of the phone calls. Plaintiff testified that the mileage for his trip to Nashville was 145 miles, which he figured at "the current IRS rate of 32 cents per mile" cost $92.80.

Plaintiff did not lose his job with Covenant as a result of the Letter. In fact, since the Letter, Plaintiff has received two raises. His salary increased from approximately $65,000 per year to $77,000 per year.

Plaintiff also testified that strange things began to happen in his life as soon as he fired Defendant. Plaintiff testified that "[a]lmost immediately after terminating [Defendant] I started receiving numerous hang-up phone calls at my home." He also testified that his cell phone would ring constantly with hang-up phone calls and his voice mail "would have dead air constantly." Plaintiff also testified I "received at my house dead squirrels, mutilated squirrels chopped in half, ripped open squirrels on my doorstep, on my porch." He testified to finding "[o]ne squirrel that looked like he had been poisoned with his legs and feet up in the air sitting right next to my mailbox." Plaintiff also testified that there were strange loud noises around his home. On several different occasions, Plaintiff called the police and upon the advice of one of the officers, Plaintiff

-4-

enclosed his back porch, installed a second door, and enclosed his fuse boxes. At that time, Defendant lived "down the street" from Plaintiff with "two houses in between [them]."

Plaintiff also testified that in early April of 2000, his car was damaged. He testified someone had poured acid, or some other substance, all over the hood of the car. The substance ate "through the paint, right through the metal." Plaintiff testified the car was parked in his driveway when the damage to the vehicle was done. Plaintiff admitted on cross-examination that he wasn't sure exactly when the damage was done and could not say for sure where the damage was done. It could have been done while the car was at the airport or elsewhere. Plaintiff testified that all of these strange happenings stopped only after Defendant was served with this lawsuit.

Plaintiff described the Covenant airplane. He testified that "[i]t's very close quarters" in the cockpit of the Covenant airplane. He explained that the aircraft has cockpit doors but that these doors are never shut, so the cockpit is never closed off from the passenger section of the aircraft. Plaintiff testified that the passenger section of the plane is approximately fifteen feet long. Plaintiff also testified that there is "constant dialogue back and forth" between the pilots and the passengers concerning such things as changes in schedules and requests to adjust the environmental controls.

Several people testified on Plaintiff's behalf including several Covenant executives who had been passengers on flights with Plaintiff, other pilots who know Plaintiff and Defendant, and Plaintiff's wife.

David Parker, Covenant's President and CEO, testified. Mr. Parker testified that the passenger cabin of the Covenant airplane was approximately 15 to 20 feet long and that the cockpit door always is left open. Mr. Parker testified that he has a lot of communication with the pilots during flight and that he watches whether the pilots are active in the cockpit. Mr. Parker further testified that on the numerous flights he has flown with Plaintiff, he has never seen Plaintiff nap or fall asleep in the cockpit, never heard Plaintiff complain of headaches, never seen Plaintiff take medication, and never noticed any personality changes in Plaintiff. Mr. Parker testified that he expects employees to report safety violations, and that Defendant never discussed with him, or reported to the company, any safety issues concerning Plaintiff.

Mike Miller, Executive Vice President and Chief Operating Officer of Covenant, testified. Mr. Miller testified that he flies approximately once a week and that he has a good view of the pilot and co-pilot from his usual seat on the plane. Mr. Miller testified he never saw Plaintiff fall asleep in the cockpit, never heard Plaintiff complain about headaches, did not recall ever seeing Plaintiff take any medication, and never noticed a change in Plaintiff's personality.

David Hughes, Covenant's treasurer, also was a passenger on flights with Plaintiff and testified at trial. Mr. Hughes testified that he has never seen Plaintiff in a motionless state as if asleep during a flight, never heard Plaintiff complain of headaches, never observed Plaintiff take any medications, and never noticed any change in Plaintiff's behavior.

Joey Hogan, Senior Vice President and CFO for Covenant and Plaintiff's direct supervisor testified that he has frequent contact with Plaintiff and that Plaintiff is the best chief pilot he has ever worked with. Mr. Hogan testified that he flies frequently and that he has never seen Plaintiff sleep in the cockpit, never heard Plaintiff complain of headaches, never seen Plaintiff take medications, and has not witnessed any personality change in Plaintiff. Mr. Hogan also testified that he talks to the pilots during flight. Mr. Hogan testified that while Defendant was the co-pilot for Covenant, Mr. Hogan noticed that Plaintiff was having to take care of duties that normally a co-pilot would take care of like stocking the airplane.

James Gregory Cole, Covenant's current co-pilot also testified. Mr. Cole testified that at the time of trial he had flown with Plaintiff for approximately two years. During that time, Mr. Cole never heard Plaintiff complain of headaches and never saw Plaintiff fall asleep in the cockpit. Mr. Cole also testified that during those two years he had seen Plaintiff take Tylenol only once and had not seen Plaintiff take any other medications. Mr. Cole testified that he has known Plaintiff since the late 1970's and that he has not noticed any changes in Plaintiff's personality. Mr. Cole also testified that as a result of Defendant's Letter, Plaintiff is less marketable than Mr. Cole, even though Plaintiff is a chief pilot and Mr. Cole is only a co-pilot.

Ron Dominic, the chief pilot for Miller Industries, knows both Plaintiff and Defendant. Mr. Dominic testified that Defendant had worked previously as a co-pilot for Miller Industries, but that Defendant had been fired because he was not able to do his job. Mr. Dominic testified that within a three to four week period of Defendant's termination, Mr. Dominic's and his son's cars were keyed. The cars were parked in the airline parking lot at that time, not in the public parking lot. Mr. Dominic also testified that although Defendant had been fired, Defendant continued to hang out in the pilot's lounge.

Scott Bryson, a pilot and aircraft manager for Bryson Aviation, testified that he has flown with Plaintiff. Mr. Bryson testified that he flew the Covenant airplane with Plaintiff immediately after Defendant was fired. Mr. Bryson testified that he has flown with Plaintiff several times since and that he has never seen Plaintiff fall asleep or nap during a flight. Mr. Bryson also testified that he has never heard Plaintiff complain of headaches, and has never seen Plaintiff take any medication. Mr. Bryson further testified that he has noticed no change in Plaintiff's personality during the five years that they have known one another. Mr. Bryson testified that he occasionally hires pilots to fly the aircraft that he manages and if a pilot had a letter such as Defendant's Letter in his file, it would "throw up a red flag." Mr. Bryson testified that Plaintiff is not as marketable as a pilot who has no such allegations in his record.

Natasha McWhorter, Plaintiff's wife, testified that since he received the letter from the FAA grounding him, her husband has been very stressed. She stated "[h]e is very preoccupied. He's not the easy, laid back, easygoing type of person that he once was when I first met him. He has become emotional at times when I've had to caress him." She also testified Plaintiff has cried "[a]bout his pride that he has for his career," and has expressed concerns about being able to take care of his family since he is "the bread winner of the family."

Ms. McWhorter also testified about the hang-up calls or prank messages that they had received since Defendant was fired. She stated her husband had received one message on his pager that he later played for her. The message consisted of "37 seconds of gunshots going off." Ms. McWhorter testified that prior to Defendant's being terminated by Covenant, they had no problem with prank calls or harassing phone calls.

Defendant testified, but produced no other witnesses on his behalf. Defendant testified that he used to be a practicing neurologist in Florida and was an "Aviation Medical Examiner for the FAA." Defendant testified that he voluntarily retired from medicine in 1986. However, Defendant's medical license had been revoked by the state of Florida. The Florida Board of Medicine found that Defendant "violated Section 458.331(1)(t), Florida Statutes, by gross or repeated malpractice or the failure to practice medicine with the level of care, skill and treatment which is recognized by a reasonably prudent similar physician as being acceptable under similar conditions and circumstances." Further, the Florida Board of Medicine found Defendant "violated Section 458.331(l)(m), Florida Statutes, by failing to keep written medical records justifying the course of treatment of the patient, including, but not limited to patient histories, examination results and test results." Defendant claims he never was served with notice of the Department of Professional Regulation's case against him, but admits he left the country and was gone for several years. When Defendant returned to the country, he did nothing to appeal the Florida Board of Medicine findings. Defendant also admitted that he had disciplinary problems for failure to complete the medical records of patients he treated at hospitals.

Defendant admitted at trial that he is familiar with the regulations in the FAA's Airman Information Manual, which state there are certain medical conditions that require mandatory grounding. The health conditions requiring mandatory grounding include, among others, a personality disorder manifested by overt acts, unexplained loss of consciousness, and drug dependency. Defendant's Letter alleges that Plaintiff suffers from all three of these conditions requiring mandatory grounding.

Defendant testified that he came to Tennessee in 1997, "to fly for initially Miller Industries and later for Covenant Transport." Defendant testified that he loved flying and "to have somebody actually pay me for flying was an incredible opportunity." However, Defendant testified that when he was fired from Covenant he was "disappointed, but I wasn't angry." He testified that he "was actually considering a change in jobs" and that he "had always wanted to write." Defendant also testified that "prior to being terminated [I] had actually begun writing some articles for magazines."

Defendant has flown with two chief pilots, Plaintiff and Mr. Dominic. Defendant alleged that both of these chief pilots fall asleep in the cockpit. However, Defendant did not write a letter to the FAA, or make any other type of complaint to the FAA regarding Mr. Dominic.

Defendant testified that there was a typographical error in the Letter. The Letter states Defendant observed Plaintiff take four 800 milligram tablets of ibuprofen at one time. Defendant

testified that "[f]our 200 milligram tablets is 800 milligrams and that's what I meant that [Plaintiff] took 800 milligrams at one time." Defendant stated he corrected this for the record, but he never communicated this correction to the FAA. Instead, Defendant merely stated the correction during discovery in this lawsuit.

Defendant also testified as to the circumstances surrounding the writing of the Letter. He stated "I was up late at night for some other reason or I woke up. It was 2 o'clock in the morning. I composed this letter on my computer. There were no drafts of this letter. I didn't reread it. I sealed it and I sent it." Defendant testified he did not read the Letter again until this lawsuit was filed. Defendant testified that he did not notice the error in the Letter until the lawsuit was filed.

Defendant testified that after he was fired, "during the early spring" he learned that the new co-pilot Covenant hired was "not rated on the airplane." Defendant testified that "the rating is that which lets you take care of emergencies should they occur." Defendant testified he "began to think about again the problem with the Payne Stewart crash." Defendant stated:

> I began to think about the various observations that I had made in the past and sort of put those together and think that if something were to incapacitate [Plaintiff] then the copilot would have to take control of the aircraft and do something that it usually takes two pilots to do. Someone on the airplane not rated would be so far behind as to make the task impossible.

Defendant testified "I did not want my friends at Covenant to be at risk and that is why I wrote this letter fully over a month, almost two months, after [Plaintiff] fired me." Defendant also testified that the FAA has a safety hot line on which callers can report problems anonymously. Defendant stated "I could have used this 800 hot line to report my observations, but I believe my observations were sufficiently important that I write a letter to the medical branch recommending tests that would assure [Plaintiff] didn't have a brain tumor, a seizure, some kind of infection of the nervous system."

Defendant admitted pilots have an obligation by law to report medical concerns to the NTSB immediately, but qualified his admission stating "[i]f there is something definable like a stroke or a heart attack or some reason [the crew member] absolutely can't fly . . . ." Defendant testified that Plaintiff slept on flights to Palm Springs, Texas, and Miami. The Covenant flight logbook shows that Plaintiff and Defendant flew only one flight to Miami together. Defendant admitted that when they flew to Miami, he was not type rated in the aircraft. Defendant, however, did not notify anyone at that time regarding Plaintiff's sleeping in the cockpit.

Defendant admitted he had no witnesses to his allegations that Plaintiff slept in the cockpit, that Plaintiff suffered behavioral changes, or that Plaintiff ever took four 800 milligram tablets of ibuprofen. In addition, Defendant admitted the only time he saw Plaintiff "with any drugs in his hand" was on the one occasion that Defendant alleges Plaintiff took four 200 milligram tablets.

Prior to trial, Defendant's counsel was granted leave to withdraw. Defendant proceeded to represent himself pro se at trial. The case was tried before a jury and judgment was entered on the jury's verdict. The jury found in favor of Plaintiff on the issue of defamation and awarded $25,000 in compensatory damages and $42,500 in punitive damages. The jury found for Defendant on the issue of outrageous conduct. Defendant hired new counsel and filed a motion for judgment notwithstanding the verdict and for a new trial and also a motion to alter or amend.

Plaintiff filed an application for award of expenses and attorney's fees based upon Defendant's failure to admit liability in response to requests for admission served during discovery. On October 9, 2002, the Trial Court entered an order awarding Plaintiff expenses and attorney's fees in the amount of $38,320.01. The Trial Court entered its amended judgment in favor of Plaintiff against Defendant for $105,820.01.

Defendant filed another motion to alter or amend. The Trial Court denied Defendant's motion for judgment notwithstanding the verdict because Defendant did not move for a directed verdict at the close of proof. The Trial Court also denied both of Defendant's motions to alter or amend holding that the jury's verdict was not contrary to the weight of the evidence or to applicable law, and finding that Defendant's failure to admit to the requests for admission caused Plaintiff to incur the legal fees and expenses awarded. Defendant appealed.

**Discussion**

Although not stated exactly as such, Defendant raises several issues on appeal: 1) whether the Trial Court erred when it granted Plaintiff's motion to alter or amend the summary judgment; 2) whether the Letter at issue was defamatory; 3) whether there was material evidence to support the jury's finding of malice; 4) whether there was material evidence to support the award of $25,000 in compensatory damages; 5) whether there was material evidence to support the award of $42,500 in punitive damages; 6) whether the Trial Court erred by allowing testimony regarding damage to Plaintiff's automobile; and 7) whether the Trial Court erred in awarding Plaintiff legal fees based upon Defendant's refusal to admit liability in response to Plaintiff's requests for admission. We will address each issue in turn.

We begin by addressing whether the Trial Court erred in granting Plaintiff's motion to alter or amend the judgment when it reconsidered and vacated its grant of summary judgment. We review a trial court's decision regarding a motion to alter or amend a summary judgment for abuse of discretion. *See Rose v. H.C.A. Health Servs. of Tennessee, Inc.*, 947 S.W.2d 144, 149 (Tenn. Ct. App. 1996); *Marr v. Montgomery Elevator Co.*, 922 S.W.2d 526, 528 (Tenn. Ct. App. 1995).

Initially, the Trial Court granted Defendant summary judgment holding Defendant's Letter was a conditionally privileged communication. The Trial Court further found there was no evidence that Defendant acted with malice so as to lose the conditional privilege. Plaintiff then filed a motion to alter or amend the Trial Court's grant of summary judgment arguing that the

-9-

determination of whether Defendant acted with actual malice was a question of fact that was in dispute and, therefore, summary judgment was improper. The Trial Court reconsidered the grant of summary judgment and entered an order granting Plaintiff's motion to alter or amend and holding that an issue of fact existed both as to the truth of the publication and as to whether it was published with malice.

Our Supreme Court has stated:

> Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion; and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts.

*Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 88 (Tenn. 2000) (citations omitted). There were genuine issues with regard to the material facts, and summary judgment was not proper. The summary judgment granted Plaintiff was a partial summary judgment as it did not adjudicate all the claims between the parties. Therefore, this summary judgment was "subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties." Tenn. R. Civ. P. 54.02. We find no error either in the Trial Court's reconsideration of the grant of summary judgment or in the Trial Court's determination that issues of fact existed making summary judgment improper. We, therefore, affirm on this issue.

We next consider whether the Letter was defamatory. The question of whether the Letter was understood by its readers as defamatory is a question for the jury, but the preliminary determination of whether the Letter is "*capable* of being so understood is a question of law to be determined by the court." *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978) (emphasis in original). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

In making the determination of whether a communication is capable of being understood as defamatory, "[t]he courts of this state have consistently followed the prevailing common-law practice of construing the allegedly libelous words in their 'plain and natural' import." *Nichols*, 569 S.W.2d at 419 n.7. In *Stones River Motors, Inc. v. Mid-South Publ'g Co., Inc.*, this Court explained that:

> [f]or a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation. A libel does not occur simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element 'of disgrace.'" W. Prosser, *Law of Torts*, § 111, p. 739 (4th Ed. 1971). *See also Memphis Telephone Company v. Cumberland Telephone and Telegraph Company*, 145 F. 904 (6th Cir. 1906) (holding

that it was not libelous to state that the plaintiff was charging twice as much for its stock as the stock was worth, since it had a right to do so); and *Sweeney v. Newspaper Printing Corporation*, 177 Tenn. 196, 147 S.W.2d 406 (1941) (holding that it was not libelous to state that the plaintiff had opposed a job application because the applicant was a foreign-born Jew).

*Stones River Motors, Inc. v. Mid-South Publ'g Co., Inc.*, 651 S.W.2d 713, 719 (Tenn Ct. App. 1983).

In this case, the Letter was capable, without doubt, of being understood as defamatory. It constituted a serious threat to Plaintiff's reputation as a pilot, the only career Plaintiff has ever known. The allegations in the Letter accused Plaintiff of violating federal law and behaving in an unprofessional manner. If the allegations in the Letter were true, Plaintiff's career as a pilot was over. If false, Plaintiff's reputation as a pilot was tarnished needlessly. The Letter carried an element of disgrace because Plaintiff's reputation as a pilot will forever have a "black mark" as a result of the Letter. The words of the Letter, taken at their "'plain and natural' import" held Plaintiff up to disgrace and ridicule as a pilot and were capable of being understood as defamatory. *Nichols*, 569 S.W.2d at 419 n.7. The Trial Court did not err in making the determination that the Letter was capable of being understood as defamatory. We affirm on this issue.

We next consider whether there was material evidence to support the jury's finding of malice. "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). As our Supreme Court has explained:

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

Defendant claimed he had a conditional privilege to make the statements in the Letter.

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a) there is information that affects a sufficiently important public interest, and

(b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

*Pate v. Service Merch. Co., Inc.*, 959 S.W.2d 569, 576 (Tenn. Ct. App. 1996) (quoting *Restatement (Second) of Torts* § 598 (1977). "The privilege can be lost, however, if the defendant does not act with good faith or acts with actual malice. When a statement is conditionally privileged, it is not actionable unless actual or express malice is shown by the plaintiff." *Id*. at 577. If a statement is privileged, it is presumed to have been made without malice and plaintiff carries the burden of proving malice. *Id*.

As this Court has explained:

The concept of actual malice in defamation cases connotes more than personal ill will, hatred, spite, or desire to injure. Rather, it is limited to statements made with knowledge that they are false or with reckless disregard to their truth or falsity. Determining whether a defendant acted with reckless disregard requires the finder of fact to determine whether the defendant 'in fact entertained serious doubts as to the truth of his [or her] publication.'

*Tomlinson v. Kelley*, 969 S.W.2d 402, 405-06 (Tenn. Ct. App. 1997) (quoting *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 75 (Tenn. Ct. App. 1986)) (citations omitted).

Plaintiff produced numerous witnesses who had flown with him as passengers or as co-pilots or pilots. Several of these witnesses flew on the same flights that Defendant flew with Plaintiff. Every one of these witnesses testified that he had never witnessed Plaintiff sleep in the cockpit, take large doses of medication, complain of headaches, or suffer a personality or behavioral change. In addition, Defendant admitted he had no witnesses to his allegations that Plaintiff slept in the cockpit, that Plaintiff suffered behavioral changes, or that Plaintiff ever took four 800 milligram tablets of ibuprofen. Defendant also admitted that he had only seen Plaintiff take medication on the one occasion on which Defendant alleges Plaintiff took four 200 milligram tablets of ibuprofen.

The evidence also showed that Defendant did not comply with the required reporting procedures of the NTSB or of Covenant by reporting immediately these allegations about Plaintiff. Instead, Defendant waited nearly two months after he was terminated and then composed the Letter on his home computer at 2 a.m.

Thus, material evidence was introduced at trial that showed Defendant either knew the allegations were false or, at the very least, acted with reckless disregard as to the truth or falsity of the allegations. As there is material evidence to support the jury's finding that Defendant acted with malice, we affirm on this issue.

We next consider whether there was material evidence to support the award of $25,000 in compensatory damages. As we have explained:

> Under Tennessee law, a plaintiff is required to prove actual damages in all defamation cases. . . . [A]ctual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury. The failure to prove special damages or out-of-pocket losses is not necessarily determinative. The issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering.

*Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 164 (Tenn. Ct. App. 1997) (citations omitted).

Plaintiff testified he suffered both embarrassment and stress as a result of Defendant's Letter. Plaintiff testified that he gained a lot of weight as a result of the stress and that he was no longer a "very laid back, easygoing person." Plaintiff stated that "even though the FAA has cleared me of this, there will always be this blemish on my record." In addition, Plaintiff's wife testified that since he received the letter from the FAA grounding him, her husband has been very stressed. She stated "[h]e is very preoccupied. He's not the easy, laid back, easygoing type of person that he once was when I first met him. He has become emotional at times when I've had to caress him." She also testified that Plaintiff has cried "[a]bout his pride that he has for his career," and has expressed concerns about being able to take care of his family since he is "the bread winner of the family."

Plaintiff further testified that he had a great deal of pride in his career as a pilot. Plaintiff testified he felt "very embarrassed" having to tell his employers that the FAA had grounded him and that they would have to cancel a flight scheduled for the next day. Plaintiff also testified it was "very embarrassing" for him to have to tell his fellow pilots he had been grounded. Plaintiff testified that the community of pilots is "very close knit" and that they "rely on one another" to gain information about other pilot's records. Plaintiff stated "if you fly anywhere in this region, in the Southeast region, everybody knows everyone. We've all been recycled to one degree or another in this industry and we all know one another." Plaintiff testified that his "reputation as a professional pilot has been tarnished."

Mr. Cole, Covenant's current co-pilot, testified that as a result of Defendant's Letter, Plaintiff is less marketable than Mr. Cole, even though Plaintiff is a chief pilot and Mr. Cole is only a co-pilot. Mr. Bryson, a fellow pilot, testified that the fact that Plaintiff now has this Letter in his file would "throw up a red flag" for future employers. Mr. Bryson also testified that Plaintiff is not as marketable as a pilot who has no such allegations in his record.

The record contains material evidence that Plaintiff's reputation and standing in the community of pilots has been impaired and that Plaintiff has suffered personal humiliation as a result of having to disclose the fact that the FAA grounded him and the allegations in the Letter to his employer and to his fellow pilots. The evidence also shows that if, in the future, Plaintiff wishes or needs to change jobs, the Letter will "throw up a red flag" for future employers. In addition, the record contains material evidence that shows Plaintiff has endured mental anguish and suffering personally, as shown by his wife's testimony that Plaintiff is stressed, has cried, and worries about his ability to support his family.

Defendant argues that Plaintiff suffered no damages because Plaintiff was unable to prove he expended any money as a result of the Letter. Although Plaintiff was unable to prove he expended money for such things as his neurological exam and long-distance phone calls, "actual injury is not limited to out-of-pocket loss." *Id.*

The record contains material evidence to support the award of $25,000 in compensatory damages. We, therefore, affirm on this issue.

We next consider whether there was material evidence to support the award of $42,500 in punitive damages. If actual malice is shown, punitive damages are permitted. *See id.* Although Defendant raises an issue regarding punitive damages, his only argument in regard to this issue is that Plaintiff did not prove actual damages or malice and, therefore, punitive damages are improper. As we have already determined that Plaintiff proved both malice and actual damages, we find Defendant's argument as to punitive damages to be without merit. We affirm on this issue.

Next, we consider whether the Trial Court erred by allowing testimony regarding damage to Plaintiff's automobile. Our Rules of Appellate Procedure provide:

> that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e). Defendant did not raise this issue in his motion for new trial, and, thus, has waived the issue.

Finally, we consider whether the Trial Court erred in awarding Plaintiff legal fees based upon Defendant's refusal to admit liability in response to Plaintiff's Requests for Admission. In requesting legal fees, Plaintiff relied upon Rule 37.03 of the Rules of Civil Procedure which states:

> If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the requesting party the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 36.01, or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that he or she might prevail on the matter, or (4) there was other good reason for the failure to admit.

Tenn. R. Civ. P. 37.03.

In this case, there is insufficient evidence to show that Defendant did not have reasonable ground to believe that he might prevail as to those requested items. Plaintiff proved his case at trial, but that, by itself, is no indication that Defendant did not believe he had a reasonable chance of prevailing at trial on those requested matters. Rule 37.03 does not require a party to believe that he *will* prevail or *should* prevail, but only that he "*might* prevail." *Id.* (emphasis added). The record does not support a holding that Defendant did not have a "reasonable ground to believe that he . . . *might* prevail . . . ." *Id.* (emphasis added). To adopt Plaintiff's position would mean that if the prevailing party has requested the other party admit that his claim or defense is invalid and the request was not admitted, the requesting party always would be entitled to his attorney fees and expenses. We do not believe this is the intent of Tenn. R. Civ. P. 37.03. We hold that the Trial Court did err in awarding Plaintiff his expenses and attorney's fees in connection with Defendant's refusal to admit liability in response to requests for admission. We, therefore, reverse that portion of the October 11, 2002, amended judgment awarding Plaintiff his expenses and attorney's fees in the amount of $38,320.01.

## Conclusion

That portion of the Amended Judgment awarding Plaintiff his attorney fees and expenses in the amount of $38,320.01 is reversed. The remainder of the amended judgment is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion and for collection of the costs below. Exercising our discretion, the costs on appeal are assessed against the Appellant, Randall Barre, and his surety.

_____

D. MICHAEL SWINEY, JUDGE

-15-